959 F.2d 757
 58 Fair Empl.Prac.Cas. (BNA) 590,
58 Empl. Prac. Dec. P 41,415,
121 Lab.Cas. P 56,892, 22 Fed.R.Serv.3d 465,
7 IER Cases 507
 John L. BROOKS, et al., Plaintiff-Appellant,
v.
HILTON CASINOS INCORPORATED, et al., Defendant-Appellee.
John L. BROOKS, Plaintiff-Appellee,
v.
HILTON CASINOS INCORPORATED, d/b/a Las Vegas Hilton, a
Nevada Corporation, et al., Defendant-Appellant.
John L. BROOKS, Frederick Amie, Norman V. Ballard, Jack A.
Bosarge, Robert A. Dawson, Douglas S. Delling,
Alan Kirk Drake, Roger H. Dudley, et
al., Plaintiffs,
and
Equal Employment Opportunity Commission,
Plaintiff-Intervenor-Appellant,
v.
HILTON CASINOS INCORPORATED, d/b/a Las Vegas Hilton, a
Nevada Corporation, Hilton Hotel Corporation,
Defendant-Appellee.
 Nos. 90-15424, 90-15460 and 90-15623.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 2, 1991.
Decided March 12, 1992.
 
 Larry L. Simms, Gibson, Dunn & Crutcher, Washington, D.C., and M. Kristina Pickering, Lionel Sawyer & Collins, Reno, Nev., for appellants-cross-appellees.
 John C. McCarthy, Mary F. Richardson and James P. Stoneman II, John C. McCarthy and Associates, Claremont, Cal., and Brian Berman, Las Vegas, Nev., for appellees-cross-appellants.
 John F. Suhre, E.E.O.C., Washington, D.C., for cross-appellant EEOC.
 Appeal from the United States District Court for the District of Nevada.
 Before: BOOCHEVER, KOZINSKI and O'SCANNLAIN, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 Plaintiffs, 37 dealers at Hilton's Las Vegas casino, were terminated as they came off their shifts on September 2 and 3, 1983. They sued and obtained jury verdicts on several state and federal law claims. Hilton challenges plaintiffs' recovery on a variety of grounds, but because of the way we resolve the state law issues we need not discuss the difficult federal and constitutional issues raised by Hilton in its appeal.
 
 
 2
 I. Breach of Contract and Bad Faith Discharge
 
 
 3
 Hilton challenges the damages awarded for breach of contract and bad faith discharge on the ground that plaintiffs were employed at will. We review the district court's determination of state law de novo. Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). By allowing the jury to consider whether these employees were covered by an implied contract, the district court implicitly held that the jury could reasonably have found such a contract. This was error. The damages award cannot stand because plaintiffs were at-will employees as a matter of Nevada law; the jury should never have been presented with the issue. Cf. Smoot v. Boise Cascade Corp., 942 F.2d 1408 (9th Cir.1991) (finding error under Washington law of district court's submitting similar claim to jury).
 
 
 4
 Plaintiffs were not employed under a written employment contract. Under Nevada law, the absence of a written contract gives rise to the presumption that employment is at will. See Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366, 368 (1989) (per curiam). Plaintiffs had the burden of rebutting this presumption by establishing that they were employed under a contract terminable only for just cause. Plaintiffs' evidence fell into four broad categories: (1) plaintiffs' longstanding satisfactory employment with Hilton; (2) inducements extended by Hilton to retain plaintiffs, including employee benefits and a retirement plan that were among the best in the industry; (3) a progressive disciplinary system, and a past practice of terminating employees only in accordance with this system; and (4) assurances and representations by Hilton's management that plaintiffs were part of the "Hilton family" and would have their jobs as long as they performed them satisfactorily.
 
 
 5
 The Nevada Supreme Court has rejected claims of contractual employment based on very similar evidence. In Vancheri, the plaintiff was not employed under a written contract, but was told by management when he came to work that "he would have a long and successful association with the GNLV family." 777 P.2d at 367. GNLV had also established a progressive discipline system. The court rejected Vancheri's argument that these circumstances could rebut the at-will presumption. As to the first factor, it said:
 
 
 6
 Vancheri was never told that his employment would be terminated only for cause or that he would have employment for life or a specified period of time. General expressions of long term employment or job advancement do not convert an at-will employment contract to a termination only for cause contract.
 
 
 7
 Id. at 369. As to the second factor, it said:
 
 
 8
 Standardized disciplinary procedures are generally positive additions to a business. They provide employers a method of cautioning employees, and afford employees an opportunity to improve job performance in order to retain employment. They also create a general consistency and security in the work place. If we were to hold that the establishment of standard disciplinary procedures for employees is, in and of itself, sufficient to convert an at-will employee to an employee who can be fired only for cause, employers would be reluctant to continue to establish them.
 
 
 9
 Id. at 369-70. The court concluded that these two circumstances were, as a matter of law, insufficient to rebut the presumption of at-will employment. Id. at 370.
 
 
 10
 In Bally's Grand Employees' Federal Credit Union v. Wallen, 105 Nev. 553, 779 P.2d 956 (1989), the court rejected similar claims by a worker who argued that she had understood she would have her job as long as she performed her duties. She testified that she had indicated to the employer at the time of the application that she was seeking permanent employment and that she had entered into all of the employer's long-term employee benefit programs. Id., 779 P.2d at 957-58. The court held that this evidence "established nothing more than Wallen's subjective expectations of continued employment, and ... is legally insufficient to rebut the presumption of at-will employment." Id. at 958.
 
 
 11
 Like the plaintiffs in Vancheri and Bally's, plaintiffs here only offered evidence of their unilateral expectations, based on common employment policies that are compatible with either at-will or dismissal-for-cause-only employment. Generous benefit packages, disciplinary procedures and general expressions of encouragement by management are all generic features of many employment relationships.[1] These factors are insufficient as a matter of Nevada law to rebut the presumption of at-will employment.[2]
 
 
 12
 Thus, the only factor which the jury properly could consider in deciding the employment contract question is whether Hilton management agreed to terminate the plaintiffs only for failure to perform satisfactorily.[3] In American Bank Stationery v. Farmer, 106 Nev. 698, 799 P.2d 1100, 1102 (1990), the Nevada Supreme Court held that an employee may rebut the at-will presumption "by proving by a preponderance of the evidence that there was an express or implied contract between his employer and himself that his employer would fire him only for cause." We hold that the evidence was insufficient as a matter of law to establish such a contract, and thus that it was error for the jury to consider the question. Its finding of an implied contract must be reversed.
 
 
 13
 Plaintiffs place great reliance on the fact that pit boss Art Castle testified that he told every dealer he hired "They'd have to get so far out of line that there would be no cause for action other than to terminate them." RT VI 140 (paraphrasing shift boss Bud Haines's purported policy). Read in context, however, this testimony does not support the plaintiffs' case. Castle testified that "[e]very time a dealer was hired in the place, I gave them this spiel, more or less. I called it a 'spiel'--that they were part of the Hilton family and that the only way they could be terminated was to terminate themselves." RT VI 139-40 (emphasis added). But every one of the plaintiffs was employed at the casino (then the International) before Hilton took over in 1972. See RT V 3. Thus Castle's statement doesn't help plaintiffs; there is no evidence that he gave them "this spiel."
 
 
 14
 Indeed, there is evidence from the plaintiffs' testimony that they were not told they would have a job as long as they performed satisfactorily. The following excerpts from the trial are typical:[4]
 
 
 15
 [Q:] "Do you know what Mr. Haines' policy was [regarding termination]?"
 
 
 16
 . . . . .
 
 
 17
 [A:] "You'd pretty much have to terminate yourself."
 
 
 18
 . . . . .
 
 
 19
 [Q:] "Did Mr. Haines ever directly tell you anything along those lines?"
 
 
 20
 [A:] "He never directly told, but I was very confident."
 
 
 21
 RT XII(A) 12 (Kustudia direct).
 
 
 22
 . . . . .
 
 
 23
 [A:] "It was the understanding that if you were to be terminated, you'd--if you were terminated, you'd terminate yourself.... That was just a feeling."
 
 
 24
 RT XII(A) 117 (Kustudia cross).
 
 
 25
 * * * * * *
 
 
 26
 [Q:] "Okay. At the time you were hired, you had no conversation with Mr. Haines about how long you would be employed. Is that true?"
 
 
 27
 [A:] "That's true."
 
 
 28
 [Q:] "And you had no discussions about the reasons for which you might be terminated. Is that true?"
 
 
 29
 [A:] "No, we had no discussions about--he gave me the list of rules. I assumed that if I followed all the rules and did my job properly, that I'd be okay."
 
 
 30
 RT XX 2-3 (Stanford cross).
 
 
 31
 * * * * * *
 
 
 32
 [Q:] "In other words he didn't say that you're going to work for Hilton until you drop dead or anything like that?"[A:] "He didn't say that. You had that impression--as long as you done your job, you always had a job."
 
 
 33
 [Q:] "Now, that phrase gets used a lot in these depositions. Did he say that to you?"
 
 
 34
 [A:] "I don't recall if he said it, it was like his policy."
 
 
 35
 [Q:] "Written?"
 
 
 36
 [A:] "I never seen it written."
 
 
 37
 [Q:] "Did you ever hear him say it?"
 
 
 38
 [A:] "Personally, no."
 
 
 39
 RT XXIII 153-54 (Neill deposition).
 
 
 40
 A generalized understanding of job security based on satisfactory performance cannot create an implied contract of employment. The Nevada Supreme Court has considered testimony strikingly similar to that in this case: "I understood as far as a contract between [the employer] and I that I--as long as I performed my duties, I would have a job." Bally's, 779 P.2d at 957 (emphasis the court's). The court found the employee's understanding insufficient as a matter of law to support a jury finding of a for-cause employment contract.
 
 
 41
 In fact, it appears that the plaintiffs only expected to continue in Hilton's employ, or assumed they would not be fired:
 
 
 42
 [Q:] "But you don't recall at any time anyone in management at Hilton saying that your job was secure as long as you perform satisfactorily, do you?"
 
 
 43
 [A:] "That was an insinuation."
 
 
 44
 [Q:] "But that was never said to you?"
 
 
 45
 [A:] "No, I never had any real discussion with management in that respect."
 
 
 46
 RT XXIII 36 (Hineline cross).
 
 
 47
 * * * * * *
 
 
 48
 [A:] "You assume when you take a job, that if you do your job, you're going to work there forever. That's just an assumption I think everyone in the world has."
 
 
 49
 RT XXIII 78 (Rexroad cross).
 
 
 50
 * * * * * *
 
 
 51
 [Q:] "Did you have an understanding as to why you could be fired from your job?"
 
 
 52
 [A:] "Well, the general understanding was that if you didn't do your job."
 
 
 53
 RT XIII(A) 29 (Newman direct).
 
 
 54
 The Nevada Supreme Court has clearly stated, however, that "[c]ontracts of employment cannot be created by the subjective expectations of an employee." Vancheri, 777 P.2d at 369. In Vancheri, the employee testified to his "understanding" that he would not be fired at will, but the court held as a matter of law that no employment contract existed.
 
 
 55
 Some of the plaintiffs had a slightly different version of the "Haines policy":
 
 
 56
 [A:] "... John Stewart ... assured me personally that I was doing a very good job, he was very happy with my work, and I had a job at the Hilton as long as I wanted one."
 
 
 57
 . . . . .
 
 
 58
 [A:] "Bud Haines told me pretty much the same thing.... [H]e said that I would have a job at that hotel or with Hilton as long as I wanted one."
 
 
 59
 RT XXVI(A) 6-7 (Drake direct).
 
 
 60
 * * * * * *
 
 
 61
 [A:] "I took the job, I assumed if I did my job in the way that they wanted me to, that I would keep the job as long as I wanted it."
 
 
 62
 RT X 31 (Saunto direct).
 
 
 63
 The Nevada Supreme Court has held that an employee's expectation of working as long as he wants is probative of an at-will relationship: Because the employee is free to leave any time before then, the employer can fire him at will. Bally's, 779 P.2d at 958. There, the employee testified that she was told she'd be employed "I guess for as long as you care to work." Id. (emphasis deleted). The court held as a matter of law that no for-cause contract was created: "This testimony described nothing more than agreement of employment for an indefinite term, and ... such an agreement is characteristic of an at-will relationship." Id.; see also Vancheri, 777 P.2d at 370: "we hold that general expressions of job longevity and advancement ... are not, as a matter of law, sufficient to establish a prima facie case rebutting the at-will employment presumption."
 
 
 64
 Furthermore, it is doubtful whether statements such as the "Haines policy" can support an implied contract at all. The Washington courts have explicitly held otherwise. Lawson v. Boeing Co., 58 Wash.App. 261, 792 P.2d 545, 548 (1990) ("repeated oral promises that so long as job performance met a certain level [the employee] would retain his supervisory position" not sufficient to raise an issue of fact), review denied, 116 Wash.2d 1021, 811 P.2d 219 (1991). We have also so held, construing Washington law. Smoot, 942 F.2d at 1409, 1411 (statement to employee that "if you do a job--your performance is right, as long as there is a job there, I don't see any reason why it wouldn't be you" insufficient evidence of employment contract to go to jury). The Nevada Supreme Court frequently looks to Washington law in employment cases. See, for example, Vancheri, 777 P.2d at 369 (citing and relying upon Irwin Concrete, Inc. v. Sun Coast Properties, Inc., 33 Wash.App. 190, 653 P.2d 1331 (1982), and Roberts v. Atlantic Richfield Co., 88 Wash.2d 887, 568 P.2d 764 (1977)).
 
 
 65
 A fair number of the plaintiffs were told nothing at all. The following exchanges are representative:
 
 
 66
 [Q:] "At the time Hilton bought [the International], did Mr. Newman say anything to you about how long you could expect to work for Hilton?"
 
 
 67
 [A:] "No, sir."
 
 
 68
 [Q:] "Or why you could be fired by Hilton?"
 
 
 69
 [A:] "No, sir."
 
 
 70
 [Q:] "Did Mr. Haines say anything like that to you?"
 
 
 71
 [A:] "No."
 
 
 72
 [Q:] "Either about how long you could expect to work or why you could be fired?"
 
 
 73
 [A:] "No, sir."
 
 
 74
 [Q:] "Nobody said anything like that to you? "
 
 
 75
 [A:] "No, sir."
 
 
 76
 RT XXXV 26 (Shailer deposition).
 
 
 77
 * * * * * *
 
 
 78
 [Q:] "And when Hilton acquired the International, they also, neither Mr. Newman or Mr. Haines--neither of them said anything to you on [how long your job was going to last or the reasons you could be terminated]?"
 
 
 79
 [A:] "No."
 
 
 80
 [Q:] "And at anytime after that at the Hilton, and anytime during your employment at the Hilton, none of your supervisors said anything to you about how long your employment was going to last, did they?"
 
 
 81
 [A:] "No."
 
 
 82
 [Q:] "Or what the reasons you could be fired were?"
 
 
 83
 [A:] "No."
 
 
 84
 [Q:] "And you also never read any documents that discussed either of those subjects, right?"
 
 
 85
 [A:] "That's right."
 
 
 86
 [Q:] "And otherwise, other than what anybody might have told you or what was in any document, other than that, you didn't have any independent understanding as to how long your employment was going to last?"
 
 
 87
 [A:] "No, I was never told anything."
 
 
 88
 RT XXXIV 17 (Zarro cross).
 
 
 89
 The Nevada Supreme Court has held on similar facts that the employees were employed at will. Smith, 752 P.2d at 234. There, as here, there was no written contract and no specific termination date. "Smith was nothing more than an at-will employee. As such, she was subject to employment termination at any time, so long as the purpose for termination did not offend the public policy of the state of Nevada." Id. at 235.
 
 
 90
 Finally, some of the plaintiffs expressly recognized the at-will nature of the employment relationship:
 
 
 91
 [Q:] "Prior to the time of your termination from the Hilton, did you believe that Mr. Kelly could fire you for no reason?"
 
 
 92
 [A:] "Yes. That's why I was concerned."RT XVIII(A) 50-51 (Dudley deposition).
 
 
 93
 . . . . .
 
 
 94
 [Q:] "So you understood ... that Mr. Kelly had the right to fire you for whatever reason?"
 
 
 95
 [A:] "Oh, I would guess so, yes. Yeah. Whether he had the right or not, I certainly believe he could terminate people."
 
 
 96
 RT XVIII(A) 51 (Dudley cross).
 
 
 97
 * * * * * *
 
 
 98
 [Q:] "Are you saying that you continued to rely upon the fact that as long as you did your job you had a job?"
 
 
 99
 [A:] "I relied on my own ability to do my job to maintain my job."
 
 
 100
 RT XI(A) 9 (Saunto direct).
 
 
 101
 . . . . .
 
 
 102
 [A:] "My job at that time was in the hands of the Hilton Corporation."
 
 
 103
 RT X 108 (Saunto direct).
 
 
 104
 Where the employees themselves acknowledge that they hold their jobs only by the employer's good graces, it cannot seriously be argued that an implied for-cause contract exists.
 
 
 105
 Almost a century ago, Oliver Wendell Holmes wrote a passage that bears frequent repetition: "[T]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs,--not on the parties having meant the same thing but on their having said the same thing." The Path of the Law, 10 Harv L Rev 457, 464 (1897). This salutary principle has been adopted by the Supreme Court of Nevada as the governing law of employment disputes. Hotel Riviera, Inc. v. Torres, 97 Nev. 399, 632 P.2d 1155, 1157 (1981) (quoting Holmes). It thus controls this case.
 
 
 106
 The jury was charged to consider the contract issue as to the plaintiffs collectively. The evidence was overwhelming that defendant was silent on the grounds for termination. Bud Haines's fire yourself policy was a general understanding rather than a term of the agreement at the time of employment. It may even have expressed indefinite employment, which is indicative of an at-will relationship. In any event, the plaintiffs' subjective expectations cannot transform employment at will into a for-cause relationship. And many of them were told nothing about the terms of employment, leaving Nevada's at-will presumption firmly in place. Some even recognized explicitly the at-will nature of their employment. As a matter of Nevada law, the plaintiffs were employed at will and therefore could be dismissed at will.[5]
 
 
 107
 It's true that a few of the plaintiffs testified that Haines or another manager told them that they would have their job as long as their performance was satisfactory. As noted, we have recently held a nearly identical statement insufficient as a matter of Washington law to create a jury question on the existence of an implied contract. Smoot, 942 F.2d at 1409, 1411. Even if such statements were sufficient to establish an implied contract, they could not sustain the verdict in this case. The court's instructions, as well as the verdict form, called for a determination of liability as to the plaintiffs as a group. Stray statements directed to a small number of individual employees cannot sustain a finding that there was an implied contract as to the group as a whole, when the large majority of the group members stated that no such statements were made to them, that they were advised to the contrary or that they were aware the contract was at will. See pages 760-764, supra. Any other conclusion would raise doubts about the constitutionality of the group adjudication of liability, an issue vigorously raised by Hilton in this appeal. See section IV, infra.
 
 
 108
 The Nevada Supreme Court's most recent employment decision, D'Angelo, does nothing to alter this analysis. In that case, the court recognized that there can be implied employment contracts, and held on the facts before it that the plaintiff had presented sufficient evidence to go to the jury on the issue. 819 P.2d at 209-11. "The issue here," the court stated, "is simply whether the employee should be denied his day in court and not allowed to present evidence." Id. at 209 n. 3. In this case the employees were given ample opportunity to present evidence of such a contract. As demonstrated above, however, the evidence presented was insufficient as a matter of Nevada law to create an implied contract and thus never should have been submitted to the jury. The D'Angelo court expressly disclaimed the notion that "any determination by [an employer] to terminate an employee is contestable before a jury." Id. (emphasis added; internal quotations omitted). It also endorsed Vancheri, which is factually similar to this case and where the court dismissed the plaintiff's claims after he had put in all his evidence. See D'Angelo, 819 P.2d at 211: "Mr. Vancheri failed, as a matter of law, to establish an agreement, express or implied, between his employer and him, that granted to him the right of continued employment." So too here. It was error to allow the jury to consider the implied contract issue, and plaintiffs cannot recover damages for breach of contract.
 
 
 109
 Nor can they recover in tort. It may be true that Hilton's stated reasons for firing the employees do not square completely with the facts. But Hilton was not required to give any reason at all for its action. "[A] bad faith discharge tort cannot be committed against an at-will employee...." D'Angelo, 819 P.2d at 212.[6]
 
 
 110
 Because plaintiffs were employed at will, Hilton was entitled to discharge them at will. They cannot maintain a cause of action under Nevada law for breach of contract or bad faith discharge. Sands Regent, 777 P.2d at 899 ("[B]oth breach of contract and bad faith discharge presuppose that the parties had an employment agreement."). The district court erred in allowing the jury to consider the existence of an implied contract, when no such contract could have existed as a matter of Nevada law. Cf. Smoot, 942 F.2d at 1411-12 (district court faced with similar facts erred in not granting a directed verdict or JNOV under Washington law). The damages awarded under these theories must be vacated.[7]
 
 
 111
 II. Intentional Infliction of Emotional Distress
 
 
 112
 Because plaintiffs were at-will employees, Hilton was entitled to terminate them without cause. Hence, their discharge did not amount to the type of willful misconduct that could serve as a predicate for the tort of intentional infliction of emotional distress. See Alford v. Harolds Club, 99 Nev. 670, 669 P.2d 721, 724 (1983) (per curiam) (upholding dismissal of plaintiffs' claims for intentional infliction of emotional distress arising from their terminations for refusal to comply with a tip pooling policy, because the tip pooling policy was legal and hence their terminations could not be wrongful).
 
 
 113
 Even had plaintiffs managed to establish that the terminations were wrongful, Nevada does not recognize a cause of action for intentional infliction of emotional distress in the employment termination context. Plaintiffs point to MGM Grand Hotel-Reno, Inc. v. Insley, 102 Nev. 513, 728 P.2d 821 (1986), and Alford, 669 P.2d 721, but neither case supports this position. Alford, as already discussed, was resolved on other grounds. In MGM Grand, the Nevada Supreme Court held only that plaintiff's claim for intentional infliction of emotional distress against his employer for conduct related to his industrial accident claim was not preempted by federal labor law. 728 P.2d at 825. The court declined to address the issue in its most recent employment decision. D'Angelo, 819 P.2d at 211, 219 n. 13. Since the Nevada Supreme Court has given no indication that the emotional distress cause of action applies in the employment termination context, and the issue is open elsewhere,[8] the district court erred in instructing the jury on this cause of action.[9]
 
 III. Punitive Damages
 
 114
 Hilton argues that plaintiffs are not entitled to punitive damages as a matter of Nevada law. It also raises constitutional challenges to the punitive damages award. We hold that the award was improper under Nevada law and therefore do not reach the constitutional issues.
 
 
 115
 Under Nevada law, a punitive damages award must be based on a cause of action sounding in tort. Sprouse v. Wentz, 105 Nev. 597, 781 P.2d 1136, 1138 (1989) (per curiam). Since plaintiffs cannot recover for bad faith discharge or for intentional infliction of emotional distress, they are left without a state law tort to support their punitive damages award.
 
 
 116
 IV. Group Determination of Liability and Damages
 
 
 117
 Hilton argues that allowing the jury to determine liability and damages on a group basis for the contract and tort causes of action violated its seventh amendment right to a jury trial, as well as the Erie doctrine and the due process clause. Because of the way we have resolved the state law issues, see esp. pages 764-765, supra, we need not reach this difficult question.
 
 V. ERISA Preemption
 
 118
 Hilton argues that plaintiffs' state law claims are preempted by the Employment Retirement Income Security Act (ERISA), 29 USC § 1001 et seq, the federal statute that governs employee benefit plans. We need not reach this issue because we have struck down the state law damage awards on other grounds.
 
 VI. ADEA Issues
 
 119
 The EEOC raises two issues regarding the damages awarded under the ADEA. First, it argues that plaintiffs should have been awarded liquidated damages in addition to back pay. Second, it argues that the district judge erred in refusing to allow the jury to award front pay. Because we have struck down the punitive damages award, these issues are easily resolved on the basis of concessions made by Hilton and the EEOC.
 
 A. Liquidated Damages
 
 120
 The jury found that Hilton's ADEA violation was willful, CR 441, Question 1A, yet did not award liquidated damages under 29 USC § 626(b). Plaintiffs and the EEOC argue that liquidated damages are mandatory once a willful violation is found. We need not resolve this issue because Hilton has made the following concession:
 
 
 121
 Because it is impossible to tell whether the punitive damages award contains a hidden award of federal liquidated damages, Hilton concedes that it would be appropriate, if the punitive damage award is reversed or remitted below $1,427,048.00 [the amount of back pay awarded to the ADEA plaintiffs], for this Court to reinstate that award up to that amount in order to ensure that the jury's finding of willfulness, which Hilton does not contest here, is implemented according to the ADEA's statutory purposes.
 
 
 122
 Hilton's Brief in Reply to the Responsive Brief of Plaintiffs and in Response to the Briefs on Cross-Appeal of Plaintiffs and the EEOC, at 87 n. 52. Accordingly, liquidated damages should be awarded in this case; the ADEA plaintiffs' back pay award should be doubled.
 
 B. Front Pay
 
 123
 Plaintiffs and the EEOC argue that the court erred in instructing the jury that it could not award front pay. The EEOC conceded in its brief, however, that "if the present verdict stands or if liquidated damages are awarded, the district court's failure to allow an award of future damages may not be an abuse of discretion under the law of this Circuit." Brief of the EEOC as Cross-Appellant, at 13 n. 19. We have ruled that plaintiffs must be awarded liquidated damages. Because plaintiffs will be getting double back pay, we conclude that the district court did not abuse its discretion in declining to award front pay. See Cancellier v. Federated Dep't. Stores, 672 F.2d 1312, 1320 (9th Cir.), cert. denied, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982).
 
 VII. Plaintiff Foltz
 
 124
 Plaintiff Foltz challenges the sanctions imposed by the district court for his refusal to provide information regarding his income, taxes and employment during the discovery process. He argues that the sanctions were improper because he based his refusal on the fifth amendment privilege against self-incrimination. In the alternative, he argues that the sanctions were excessive.
 
 
 125
 We undertake a two-part inquiry in reviewing a discovery sanction when the party has asserted a fifth amendment privilege: "(1) did the party resisting discovery properly assert his Fifth Amendment privilege, and (2) if not, did the district judge abuse his discretion in imposing the sanction involved." Davis v. Fendler, 650 F.2d 1154, 1159 (9th Cir.1981) (footnote omitted), citing Baker v. Limber, 647 F.2d 912 (9th Cir.1981).
 
 
 126
 Applying the first part of this test, we find that Foltz did not have a fifth amendment privilege concerning the requested information and records. Foltz' concern is that disclosure of this information might have subjected him to prosecution for tax crimes. But the fifth amendment's self-incrimination clause does not give taxpayers a right to withhold financial information from the IRS unless they can show an appreciable possibility of prosecution for a non-tax crime. Fuller v. United States, 786 F.2d 1437, 1439 (9th Cir.1986). We have applied this principle in the civil discovery context, upholding dismissals of taxpayers' actions for redetermination of deficiencies when taxpayers refused to comply with the IRS's discovery requests on fifth amendment grounds. McCoy v. CIR, 696 F.2d 1234, 1236 (9th Cir.1983); Edwards v. CIR, 680 F.2d 1268, 1270 (9th Cir.1982).
 
 
 127
 Since Foltz could not assert the fifth amendment vis-a-vis the IRS directly in the civil discovery context when he faced the possibility of incriminating himself with regard to tax crimes, it is difficult to see how he could have a fifth amendment privilege vis-a-vis third parties. Foltz cites no authority for such a privilege and it is doubtful that any such authority exists. Plaintiffs who voluntarily come into court and seek economic damages must be prepared to prove their economic loss: "The scales of justice would hardly remain equal ... if a party can assert a claim against another and then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim." Lyons v. Johnson, 415 F.2d 540, 542 (9th Cir.1969), cert. denied, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970).
 
 
 128
 Although sanctions were appropriate because Foltz did not have valid reasons for resisting discovery, we conclude that the sanctions imposed in this case were excessive. The district judge shut Foltz out of any recovery.[10] This was an abuse of discretion because Foltz only withheld information that pertained to his claims for economic loss. His refusal did not prevent the jury from assessing his claims for emotional distress, punitive damages or reinstatement to the pension plan. Hence, the court was justified in determining that he could not recover economic damages such as back pay, but erred in barring him from other relief. We have overturned the punitive damages and emotional distress awards, but Foltz must be reinstated to the pension plan.
 
 VIII. Plaintiff Delling
 
 129
 Plaintiff Delling contests the district court's factual finding regarding the date he became disabled.[11] The court found that Delling became disabled on October 15, 1985, and would have left Hilton's employ on February 20, 1986. Delling contends that the correct disability date is June 1, 1986.
 
 
 130
 We conclude that this factual determination had adequate support in the record. The district court adopted the disability date used by Hilton's expert economist in a report on plaintiffs' damages. Exhibit B-L, at 2. The expert based this date on a statement of Delling's earnings record produced by the Social Security Administration. Id at 14, n. 5. Delling argues that his trial testimony establishes the later date. His trial testimony, however, mentions several possible disability dates. For purposes of obtaining unemployment benefits, he claimed that he was disabled as early as September 1984. RT XXXII(A) 53-54. He later applied for social security disability benefits and claimed that the onset of his disability was in 1985. Id at 56-58. He also testified that he considered himself to be totally disabled and not able to work after a hospitalization in the middle of 1986. Id at 45-46. He concedes that he did not in fact work after August 1985, when he was fired from a taxi driver job because he could not lift luggage. Brief of appellees/cross-appellants, at 83 n. 98.
 
 
 131
 Considering all the evidence, the district court's finding that Delling became disabled on October 15, 1985, was not clearly erroneous.
 
 Conclusion
 
 132
 Plaintiffs were victims of age and sex discrimination and will recover damages under Title VII and the ADEA. The plaintiffs who recovered under the ADEA are also entitled to liquidated damages. Plaintiffs are not entitled to additional contract or tort damages under Nevada law. The awards for breach of contract and bad faith discharge, emotional distress and punitive damages are vacated. Plaintiff Foltz is entitled to reinstatement to the pension plan.
 
 
 133
 The judgment is REVERSED and the case is REMANDED for entry of judgment consistent herewith.
 
 
 134
 BOOCHEVER, Circuit Judge, concurring and dissenting Nos. 90-15424, 90-15460 and 90-15623
 
 
 135
 The principal issue presented by this appeal is whether there was sufficient evidence to present a jury question regarding an implied contract of employment between the Las Vegas Hilton and its 37 fired employees. Because it misconstrues Nevada law in resolving this issue, the majority dismisses categorically several types of evidence which the jury properly considered. The majority also mischaracterizes the evidence consisting of Hilton's numerous assurances to plaintiffs that they would be terminated only for cause, as nothing more than the plaintiffs' subjective expectations or a few "stray statements." Not only do I believe that the totality of the facts support a triable issue which was properly submitted to the jury, but I fear that the majority's interpretation of Nevada law regarding implied contracts seriously erodes the factfinding function of the jury. I respectfully dissent.
 
 I.
 
 136
 Under Nevada law, the at-will presumption may be rebutted by evidence of an implied contract of employment. See Bally's Grand Employees' Fed. Credit Union v. Wallen, 105 Nev. 553, 779 P.2d 956, 957 (1989) (per curiam). If such evidence exists, the factfinder may determine whether an employer has "a contractual obligation not to discharge the employee without first abiding by conditions relating to dismissal which are either expressly agreed upon by the parties or inferable from the dealings and practices of the parties." D'Angelo v. Gardner, 107 Nev. 704, 819 P.2d 206, 209 (1991). See also K Mart Corp. v. Ponsock, 103 Nev. 39, 732 P.2d 1364, 1366 n. 1 (1987) (recognizing that the at-will presumption can be rebutted by even "a tacit agreement [which] was implied in fact from the conduct of the parties").
 
 
 137
 The factfinder may consider various types of evidence in determining whether an implied "for-cause" employment contract existed. An employee handbook or detailed procedures for discipline and dismissal of employees may be evidence of an enforceable contract. See Southwest Gas Corp. v. Ahmad, 99 Nev. 594, 668 P.2d 261, 261-62 (1983) (employee handbook); D'Angelo, 819 P.2d at 212-13 (disciplinary procedures listed in handbook). Other relevant evidence may be the "dealings and practices of the parties," id. at 209, and expressions of job security conditioned upon satisfactory job performance. See K Mart, 732 P.2d at 1366 n. 1 (finding the at-will presumption rebutted by, inter alia, employer's oral and written "represent[ation] to [plaintiff] that he would remain on the job until he retired as long as he did his job satisfactorily"). It is less clear whether longevity of employment can support a finding of an implied contact, although it is relevant in analyzing whether a bad faith discharge claim exists. See D'Angelo, 819 P.2d at 215 (suggesting that an employee with almost ten years of employment would be more likely to prevail on a bad faith tort claim than one with less than two years employment). Any one of these factors alone is often insufficient to defeat the at-will presumption. See, e.g., Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366, 369-70 (1989) (refusing to find that the establishment of disciplinary procedures for employees "in and of itself" rebuts the at-will presumption). Rather, it is the totality of the circumstances surrounding the employment relationship that must be examined. See Stone v. Mission Bay Mortgage Co., 99 Nev. 802, 672 P.2d 629, 629-30 (1983) (per curiam) (reversing summary judgment for employer despite employee's signed application agreeing that she could be terminated at any time, because other evidence raised a question of fact as to whether the application was intended to be the contract between the parties).
 
 
 138
 Here, the plaintiffs' evidence included: (1) the longevity of their employment, ranging from 11 to 17 years; (2) a written handbook setting forth rules providing the basis for discipline and termination; (3) Hilton's practice of giving written warnings before terminating employees; (4) statements by Hilton management that the plaintiffs would have their jobs, so long as they performed their jobs satisfactorily; (5) promises by Hilton management following layoffs in 1982 and 1983, that "there will be no more layoffs" and "no more terminations"; (6) assurances of job security when discouraging a union organizing effort; and (7) statements that the plaintiffs were part of "the Hilton family." Under Nevada law, the totality of the circumstances presented by the evidence raised a question of fact for the jury to decide whether there was an implied contract of employment.
 
 
 139
 A. Evidence Other Than Hilton's Representations
 
 
 140
 The majority dismisses several types of relevant evidence, by concluding that general expressions of long-term employment, standard disciplinary procedures, longevity of service, and subjective expectations of continued employment should not have been considered by the jury at all. See Majority Opinion, at 759-761. In fact, all the evidence presented by the plaintiffs, taken as a whole, was properly considered by the jury because the collective evidence raised a question of fact whether the at-will presumption had been rebutted, even if some of the evidence, considered in isolation, would have been insufficient.
 
 
 141
 I agree with the majority that "[g]eneral expressions of long term employment or job advancement" or "the establishment of standard disciplinary procedures ... in and of itself " is insufficient to convert an at-will employee to a for-cause employee. Vancheri, 777 P.2d at 369-70 (emphasis added). Similarly, no one disputes that evidence "establish[ing] nothing more than ... subjective expectations of continued employment, ... is legally insufficient to rebut the presumption of at-will employment." Bally's, 779 P.2d at 958 (emphasis added). Although, as I have indicated, Nevada law is less clear about the relevance of longevity of service in determining whether an implied contract exists, cf. D'Angelo, 819 P.2d at 215, I will assume, arguendo, that longevity of service alone is also insufficient to rebut the at-will presumption.
 
 
 142
 The problem lies in the leap of logic made from these statements of law. Taken together, these cases merely stand for the proposition that any one or, at best, two of the following factors--general expressions of long-term employment, the establishment of disciplinary procedures, longevity of service, or an employee's subjective expectations--do not defeat the at-will presumption. See, e.g., Vancheri, 777 P.2d at 370 (general expressions of job longevity and disciplinary procedure described in that case are insufficient to rebut the at-will presumption). These cases, however, say nothing about the relevance of such evidence when they constitute only part of the cumulative case-in-chief presented by a plaintiff. Indeed, given the care with which the Nevada Supreme Court qualified its holdings, Vancheri and Bally's actually imply that general expressions of long-term employment or disciplinary procedures, when considered with other types of evidence, must be considered by a jury to resolve whether an implied contract existed. This understanding of Vancheri--that only a limited set of facts will completely bar jury resolution of the implied contract issue--was recently confirmed by the Nevada high court's own description of that case: "We said in Vancheri that the mere establishment of [disciplinary] procedures by an employer would not 'in and of itself ' create an obligation of continued employment." D'Angelo, 819 P.2d at 211 (emphasis added).
 
 
 143
 Thus, an inadvertent flaw in logic leads to the majority's conclusion that "the only factor which the jury properly could consider in deciding the employment contract question is whether Hilton management agreed to terminate the plaintiffs only for failure to perform satisfactorily." See Majority Opinion at 760-761. Nevada law does not support that majority linchpin. Therefore, I would find that the jury properly considered, in resolving the implied contract question, the evidence of Hilton's progressive disciplinary system as set forth in its employee handbooks, its longstanding practice of providing warnings prior to terminating employees, its general expressions of long-term employment, the longevity of the plaintiffs' satisfactory service, and the inducements extended by Hilton to retain the plaintiffs.
 
 
 144
 B. Specific Representations of For-Cause Employment
 
 
 145
 Turning to the crux of the plaintiffs' case, the majority characterizes Hilton's representations as nothing more than the plaintiffs' "subjective expectations" that they would not be fired. It further claims that the "large majority" of the plaintiffs did not receive such assurances or that they were advised to the contrary. See Majority Opinion, at 764-765. In doing so, the majority overlooks the substantial evidence of specific promises and representations by Hilton management that the plaintiffs' employment would continue, as long as the plaintiffs performed satisfactorily. Moreover, the majority's attempt to cast these representations as unfounded assumptions or "stray statements" is undermined by the fact that Hilton made some of these representations in response to specific employee concerns about job security during critical points in the Las Vegas Hilton's history. As the quantity, quality, and factual context of Hilton's representations indicate below, more than enough evidence existed for a jury to infer that Hilton modified the "at-will" relationship because it did not want the plaintiffs to leave their jobs.
 
 
 146
 1. Representations at commencement of and during employment
 
 
 147
 First, numerous plaintiffs testified that they had received from Hilton management assurances of "for cause" employment--i.e., employment as long as they did their jobs properly--at the time of their hiring or during their term of employment. The following excerpts from the trial are but a few examples:[1]
 
 
 148
 [Q:] When you were hired at the Hilton, did you have any conversation with Mr. Haines or anyone else in management regarding how long you could expect to work there?
 
 
 149
 [A:] Yes. As we were walking to see Newman, Mr. Haines told me that this was a good job, good working conditions, and I'd never have to worry about my job as long as I did it, that I'd have--the only way I can be fired would be to fire myself.
 
 
 150
 RT XXXII(A)-9 (Delling direct).
 
 
 151
 * * * * * *
 
 
 152
 [Q:] Were you told anything by management with regard to job security?
 
 
 153
 ....
 
 
 154
 [A:] Well, I was told by Jimmy Newman that for as long as I did my work properly, I'd have a job.
 
 
 155
 [Q:] And what was Jimmy Newman's position at the time?
 
 
 156
 [A:] He was the casino manager.
 
 
 157
 [Q:] Now, in 1971, when Hilton acquired the International, do you recall what changes, if any, occurred?
 
 
 158
 [A:] In management itself none, really. None that affected the dealers. All the management was pretty much still the same. Jimmy Newman was still the casino manager.
 
 
 159
 RT XXX-11-12 (Borsage direct).
 
 
 160
 * * * * * *
 
 
 161
 [Q:] Did anyone from Hilton management tell you anything about how long you could expect to be employed?
 
 
 162
 [A:] When I started after my dealers training program, Mr. Hybarger, he took me in the office and told me, said, "As long as you do your job, and keep your nose clean, you don't have anything to worry about."
 
 
 163
 RT XX-34 (Pollins direct).
 
 
 164
 * * * * * *
 
 
 165
 [Q:] Did you ever receive any assurances--did anyone from management ever say anything that led you to believe--that your job was secure?
 
 
 166
 [A:] Well, at the time that I was hired, Bud Haines told me that I was a good dealer; and it was his policy that as long as we performed our job satisfactorily, that we would always have our jobs. And I received numerous remarks of the same nature over the years from Bud Haines.
 
 
 167
 RT XXIX(A) 60-61 (Landers direct).
 
 
 168
 See also RT XXIII-13 (Hineline); RT XXVIII-102 (Grace); RT XXIX-27 (Dawson); RT XXXI-9 (Prewitt); RT XXXII-49 (Jodra); RT XXXII(A)-9, 11 (Delling); RT XXXIV(B)-39, 42, 45, 53 (Penny); RT XIX-22 (Brooks).
 
 
 169
 The majority points out that Art Castle may not have told the plaintiffs at the time of their hiring that they could only be terminated by terminating themselves. See Majority Opinion at 760-761. This is of little significance when the record reveals that other members of Hilton management did make such representations to some plaintiffs at the time of hiring and thereafter. See Ahmad, 668 P.2d at 262 (recognizing that employers and employees are free to modify the terms of their employment relationship after the commencement of employment).
 
 
 170
 The majority also presents selective portions of the plaintiffs' evidence to question the jury's determination that an implied contract existed between Hilton and the plaintiffs. See Majority Opinion, at 761-764. Yet the majority fails to include testimony by the very same plaintiffs tending to diminish or place into context the impact of the selected excerpts. For example, plaintiff Stanford is quoted as "assuming" that his job would be secure as long as he complied with Hilton's rules and did his job properly. See Majority Opinion, at 761. The majority, however, fails to point out that this assumption stemmed from management's practice of giving warnings before terminations:
 
 
 171
 [A:] ... Bud Haines always had a policy that as long as you did your job, you really wouldn't have any problem. It was kind of a fire-yourself type thing. If you had a problem, he would come to you and warn you. If you did it again, he may warn you again. And probably the third time you were out the door. But he always gave you a couple of chances to clean up your act.
 
 
 172
 RT XIX-124 (Stanford direct).
 
 
 173
 Similarly, the majority quotes plaintiff Hineline to illustrate that plaintiffs had only expectations or assumptions about continued employment. See Majority Opinion, at 762. Again, in doing so, the majority overlooks testimony which raises a question as to whether Hineline's assumptions arose from direct representations of job security from Hilton management:
 
 
 174
 [A:] ... I had talked to Sam Belkan about ... whether or not I had anything to worry about as far as job security. And like I stated before, that he said that as long as I did my job, and kept my nose clean, I'd have a job. That was what he stated.
 
 
 175
 RT XXIII-13 (Hineline direct).
 
 
 176
 Cross-examination is the "greatest legal engine ever invented for the discovery of truth." California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (quoting 5 J. Wigmore, Evidence § 1367 (3d ed.1940)). And often witnesses' testimony on direct examination is weakened by clever cross-examination. Other than in unusual cases, however, this merely presents a question for the jury as to the strength of the testimony. In evaluating this evidence, we must be mindful that "[t]he very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." Schulz v. Pennsylvania R.R. Co., 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668 (1956) (quoting Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944)). Moreover, "[i]t is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences." Id. at n. 8 (quoting Tennant, 321 U.S. at 35, 64 S.Ct. at 412). Thus, although the majority properly points out portions of the record tending to weaken the plaintiffs' case, other evidence from those same witnesses indicate that they had received assurances of continued employment and support the district court's decision that a jury question existed.
 
 2. Meeting following the Hilton fire
 
 177
 Plaintiffs also presented evidence that, in the aftermath of the 1981 Hilton fire, management held a meeting to thank them for their willingness to volunteer as maids and porters as Hilton coped with the damage. During this meeting, management reassured the plaintiffs that their jobs were secure, despite the troubles that beset Hilton because of the fire:
 
 
 178
 [Q:] Do you recall any other meeting where someone from Hilton management talked to you about job security?
 
 
 179
 [A:] Well, the next meeting we had happened after the fire.... We were called to a meeting when we were supposed to be reintegrated back to work.... [Lewin told] us that the Hilton Corporation would open the hotel even with the tower still damaged by the fire, that he would open the hotel for us, the employees, because we were part of the Hilton family. And he told us that we did not have to worry about our jobs with the Hilton as long as we continued working in the same manner we had worked to up to the fire.
 
 
 180
 RT XXXII-49 (Jodra direct).
 
 
 181
 * * * * * *
 
 
 182
 [Q:] Did Mr. Lewin say why he was holding this meeting?
 
 
 183
 [A:] No, but I think they was talking about--if I recall--going back to work [after the fire].... But [Lewin] was talking, giving thanks to all of us for the job we performed in the hotel, you know....
 
 
 184
 . . . . .
 
 
 185
 [Court:] Just tell us what [Lewin] said.
 
 
 186
 [A:] So he said I've got a secure job. I've got no problems at all.
 
 
 187
 RT XXX 81-82 (Torres direct).
 
 
 188
 3. Preventing union organizing efforts at the Hilton
 
 
 189
 The testimony at trial also revealed that Jimmy Newman, Hilton's casino manager, assured plaintiffs of job security in an attempt to discourage employee interest in joining a union:
 
 
 190
 [A:] There was [a union scare] ... and Jimmy [Newman] wanted to nip it in the bud by talking to all of us, saying ... you know, a union is a bad thing.... That as long as you guys do what you're supposed to do you will have a secure job.
 
 
 191
 RT XXXIV(B) 39 (Penny direct).
 
 
 192
 * * * * * *
 
 
 193
 [A:] ... once we were having union talk going around. Mr. Newman talked to some groups and told us we had the best job in town and the best conditions and the best job security, and we didn't need a union.
 
 
 194
 [Q:] And did you believe that was true?
 
 
 195
 [A:] Yes.
 
 
 196
 RT XXXII(A)-11 (Delling direct).
 
 
 197
 4. Meeting following the "St. Patrick's Day Massacre"
 
 
 198
 The record also indicated that Hilton management held a meeting specifically to assure plaintiffs of job security after Hilton fired a large number of employees in the so-called "St. Patrick's Day Massacre" of 1982:
 
 
 199
 [A:] There was a--the terminations we've been talking about, the St. Patrick's Day Massacre occurred, and there was some concern in the casino pits as to the reasons why....
 
 
 200
 And Mr. Lewin's first statement, I believe, was "This meeting is about job security. We've had a recession. We've had to let some people go. There will be no more mass firings or terminations," and that we're all a big family. "This is the group we want. We're pleased with you people," ...
 
 
 201
 RT XIX-21 (Brooks direct).
 
 
 202
 * * * * * *[A:] They had several major layoffs, and after two or three of them [Lewin] called another meeting....
 
 
 203
 ....
 
 
 204
 [A:] ... They just dumped off a bunch of people, two times, and they evidently heard that we were getting a little skittish, and to try to calm us down they had another meeting.
 
 
 205
 ....
 
 
 206
 [A:] ... And [Lewin] mentioned again about being a family and he wanted to do the best thing he can for us. That's about the only thing that really stood out in my mind that he talked about other than, you know, he wanted to reassure us that our jobs were secure....
 
 
 207
 RT XXXIV(B) 46-48 (Penny direct).
 
 
 208
 * * * * * *
 
 
 209
 [Q:] Now after these mass terminations, were you at all concerned about your job?
 
 
 210
 [A:] No, ma'am, I really wasn't concerned with my job.... [B]ut, there was a lot of concern in the hotel. That was very obvious, simply because it was so noticeable that I think Hilton management decided to hold a meeting to try to insure [sic] people that there would be no more than that.
 
 
 211
 Mr. Lewin, I believe Mr. Hilton, Mr. Newman--there was a lot of people at that meeting.... [Lewin] let us know that there would be no more of that [mass firings], and that we were a part of the Hilton Corporation. We were, as his words I might say, we were part of the Hilton family.
 
 
 212
 RT XXIII-50 (Rexroad direct).
 
 
 213
 5. Assurances of no more firings after 1983 management firings
 
 
 214
 The Hilton terminated several senior casino management officials the following year. The Hilton's blackjack pit manager John Stewart, however, personally assured numerous plaintiffs that there would be no more terminations and that management was satisfied with the team it had in place:
 
 
 215
 [A:] ... [Stewart] says, "I realize there's a lot of apprehension around the hotel right now because of the recent firings, but that's over and done with and as far as we're concerned, you're on our team."
 
 
 216
 RT X-61 (Saunto direct).
 
 
 217
 * * * * * *
 
 
 218
 [A:] ... [Stewart] come through and he told me personally and he was quite loud, you know. He said that there will be no more terminations, everything is running beautiful now. We did what we had to do, and now there won't be any more terminations. Everything will be fine from here on.
 
 
 219
 RT XXIV(A)-8 (Mikitaroff direct).
 
 
 220
 * * * * * *
 
 
 221
 [Q:] Did anyone from Hilton management ever say anything to you after Mr. Haines had left?
 
 
 222
 ....
 
 
 223
 [A:] John Stewart--I think it was within a couple of days after Bud Haines had left.... [A]nd [Stewart] told us that we had nothing to worry about, that there wasn't going to be any changes, that that was the end of the changes.
 
 
 224
 RT XXIX(A)-61 (Landers direct).
 
 
 225
 * * * * * *
 
 
 226
 [A:] Well, John Stewart, he came up to the dealers room after one of the big layoffs that they had.... [A]nd he said 'Hey, fellows, it's all over. There's not going to be any more firings, et cetera. Just do what you're supposed to do and your job is secure,' is what he said to these three guys at the card table.
 
 
 227
 RT XXXIV(B) 41-42 (Penny direct).
 
 
 228
 The majority characterizes the above evidence as nothing more than "[s]tray statements directed to a small number of individual employees." See Majority Opinion, at 764. The record belies this characterization. At least two meetings, the meetings following the Hilton fire and the St. Patrick's Day Massacre, were held in part for the express purpose of assuring plaintiffs that their jobs would remain secure, notwithstanding the fire and layoffs that so troubled the employees. Senior Hilton management officials, including Chairman Barron Hilton, attended one of these meetings where promises of job security were made, thereby lending further legitimacy to these representations. See RT XXIII-50 (Rexroad direct).
 
 
 229
 The majority also seeks to cast doubt on the relevance of these many representations of job security by citing a Washington case and a federal diversity case applying Washington law. See Smoot v. Boise Cascade Corp., 942 F.2d 1408 (9th Cir.1991); Lawson v. Boeing Co., 58 Wash.App. 261, 792 P.2d 545, 548 (1990), rev. denied, 116 Wash.2d 1021, 811 P.2d 219 (1991). Nevada, not Washington law, governs this case. The Nevada Supreme Court has declared that such oral promises of job security, conditioned upon satisfactory job performance, can be considered in support of a finding that the at-will presumption has been rebutted. See K Mart, 732 P.2d at 1366 n. 1.
 
 
 230
 Nevada courts have also observed that "employees may be induced by employers to ... remain on the job by the conduct, policy and implied promises of the employer. Such employees may, accordingly, have enforceable rights which can be asserted in the courts." D'Angelo, 819 P.2d at 213 (discussing with approval Foley v. Interactive Data Corp., 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988)). Here, substantial evidence indicates that the plaintiffs' expectations arose from Hilton's affirmative representations of job security and of terminations only for cause. Thus, their expectations were not unilateral or unfounded. Given the factual backdrop of these assurances, a reasonable jury could conclude that Hilton's "conduct, policy and implied promises" revealed a desire to modify the employment relationship to one other than "at-will" for good reasons: the retention of "the best employees in the business" who had demonstrated loyalty in the aftermath of a devastating fire, the belief that an implied "for-cause" relationship with employees was an economically sounder alternative than unionized employees, and the need to prevent "skittish" employees from seeking employment elsewhere after the mass firing of other employees. Although we cannot state as a matter of law whether Hilton's representations actually established an implied contract, there was certainly more than enough evidence to raise a question of fact as to whether such an employment relationship existed.
 
 
 231
 Unfortunately, I must disagree with the majority's belief that the recently decided case, D'Angelo v. Gardner, 107 Nev. 704, 819 P.2d 206 (1991), does not affect our analysis. In D'Angelo, the Nevada Supreme Court affirmed the importance of a jury's role in resolving factual questions regarding the nature of an employment contract,[2] by holding that an employee handbook, which contained provisions relating to termination for proper cause, provided sufficient evidence to submit the implied contract issue to the jury. Id. 819 P.2d at 210. In the case before us, there was also evidence of Hilton's handbooks containing provisions relating to grounds for termination. See Tr. Ex. 62. D'Angelo provoked a bitter dissent decrying its impact as "strik[ing] at the validity or decency of the at-will employment doctrine" because it "virtually paves the way for a challenge to all forms of termination in Nevada based upon 'conditions relating to dismissal which are ... inferable from the dealings and practices of the parties.' " Id. at 230 (Steffen, J., dissenting) (quoting majority opinion, id. at 209).
 
 
 232
 Contrary to the majority's view that D'Angelo "endorsed" Vancheri, the case also distinguishes and limits Vancheri. See Majority Opinion, at 765. In refusing to find Vancheri dispositive, D'Angelo cites Vancheri as an example in which a dearth of evidence bars a jury from resolving the questions of fact usually within its realm. The D'Angelo dissent recognizes as much, when it complains that:
 
 
 233
 ... the majority's disregard of the clear doctrine recently announced by this court in Vancheri introduces nothing but uncertainty and confusion in the area of wrongful discharge and at-will employment. Moreover, the majority undermines this court's unanimous declaration in Vancheri concerning the importance of permitting employers to develop sound disciplinary procedures to caution employees....
 
 
 234
 D'Angelo, 819 P.2d at 227 (Steffen, J., dissenting).
 
 
 235
 The instant case resembles D'Angelo more than Vancheri. Here, the plaintiffs marshalled equally compelling evidence as that presented in D'Angelo. In fact, not one, but numerous, representations assured them of termination only for cause, unlike plaintiff D'Angelo, who "received no commitments or promises regarding length or security of his employment...." D'Angelo, 819 P.2d at 224 (Steffen, J., dissenting). This, of course, was in addition to the evidence discussed earlier regarding Hilton's written disciplinary system described in the handbooks, its established practice for providing warnings prior to terminations, and the longevity of plaintiffs' employment. In contrast, the evidence in Vancheri merely consisted of general expressions of job longevity and a disciplinary procedure that may not have even applied to the plaintiff.[3] See Vancheri, 777 P.2d at 369. The extent of the representations made to the plaintiff was that "he would have a long and successful association with the GNLV family," id. at 367, and that he had "a great future" and advancement potential within the business. Id. at 369. These remarks are a far cry from the explicit assurances to the plaintiffs here that they would not be terminated if they performed satisfactorily and that there would be no more firings.
 
 
 236
 The majority's reliance on Bally's, 779 P.2d at 957, and Smith v. Cladianos, 104 Nev. 67, 752 P.2d 233 (1988), is also misplaced. The plaintiff in Bally's only presented evidence regarding her subjective expectations of for-cause employment and her participation in long-term employee benefit programs, without pointing to affirmative representations of for-cause employment, as plaintiffs have done here. Bally's, 779 P.2d at 957-58. Smith involved an employee fired for alleged insubordination, who primarily relied on a handbook provision regarding probationary employees to rebut the at-will presumption. Smith, 752 P.2d at 234-35. Unlike the Hilton plaintiffs, at no time did she allege that the employer had represented that she would not be terminated except for cause.
 
 
 237
 This is not to say that no evidence supports the majority's suggested result that no implied contract existed. As the majority itself details, some plaintiffs were unable to recall the specific representations which gave rise to their understanding that they would have a job as long as they performed satisfactorily. See, e.g., RT XII(A) 12, 117 (Kustudia); RT XX 2-3 (Stanford); RT XXIII 153-54 (Neill). Yet the record also revealed significant evidence, in quantity and quality, to support the finding of an implied contract. See excerpts quoted supra at 771-775. Evaluating the strength of opposing evidence is the traditional function of the jury. Here, such evidence was more than sufficient to raise a question whether an implied, "for-cause" relationship existed.
 
 
 238
 Because the resolution of this close issue likely turned on the inferences to be drawn from the conflicting evidence and the credibility of the witnesses, I find it particularly troubling that the majority has, in effect, usurped the jury's factfinding function in this case. It is the jury's function, not ours, to weigh conflicting evidence and judge the credibility of the witnesses. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1024 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). Moreover, we must assume that the jury believed all of the evidence that was helpful to the plaintiffs and inferred favorable conclusions from the evidence. K Mart, 732 P.2d at 1366. The presence of conflicting evidence does not provide grounds for us to engage in de novo weighing of the evidence, in order to conclude that the jury was precluded from considering the implied contract issue. If anything, such evidence underlines the critical importance of the jury's role in a case such as this and dictates that the jury verdict stand. Under the appropriate standard of review, I am convinced we should affirm the district court's conclusion that sufficient evidence existed for submission to the jury of the issue of whether the at-will presumption had been rebutted. Accordingly, I believe the jury's award for damages for breach of contract should be affirmed.
 
 II.
 
 239
 Because the jury properly decided that the terminations were wrongful, I would not find, as the majority does, that the district court erred in instructing the jury on the intentional infliction of emotional distress claim. The Nevada courts have not addressed the issue of whether a cause of action for intentional infliction of emotional distress exists in the employment termination context. See D'Angelo, 819 P.2d at 211, 219 n. 13. This court is, therefore, free to decide what it believes the Nevada Supreme Court would hold. The absence of a specific Nevada ruling does not, as the majority states, foreclose recovery for intentional infliction of emotional distress in the employment termination context, when the Nevada courts have given no indication that such a cause of action is barred here. See Paul v. Watchtower Bible & Tract Soc'y, 819 F.2d 875, 879 (9th Cir.) ("Federal courts are not precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controversy."), cert. denied, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). I believe the preferable alternative in this case is to certify the issue to the Nevada Supreme Court for its resolution. See, e.g., In re 268 Ltd., 877 F.2d 804, 806 (9th Cir.1989) (certifying to Nevada Supreme Court an unresolved issue regarding state statutory interpretation), certified quest. answered sub nom, Joseph F. Sanson Inv. Co. v. 268 Ltd., 795 P.2d 493, 497 (Nev.1990) (per curiam), answer conformed to, 912 F.2d 469 (9th Cir.1990).
 
 
 240
 Although I believe that the jury's finding of an implied contract should be upheld, because I am in the minority on this issue, it would be superfluous in this dissent to reach the questions of whether there was a basis for the bad faith claim or the award of punitive damages, or to address the issues regarding ERISA preemption and the group determination of liability and damages.
 
 
 241
 Assuming, without necessarily agreeing, that punitive damages should be stricken, I concur with the majority's conclusion that liquidated damages should be awarded to the ADEA plaintiffs and that the district court did not abuse its discretion in declining to award front pay. With the exception of the reference to the punitive damages and emotional distress awards, issues on which I do not express an opinion, I also agree with the majority's disposition of the claims of plaintiffs Foltz and Delling.
 
 III.
 
 242
 I am concerned that the majority has misconstrued Nevada law and overlooked important evidence clearly indicating that sufficient evidence was presented to raise a question of fact regarding the existence of an implied contract. This question was properly submitted to the jury. It is particularly in cases like these that we must remember that appellate "courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Sanders v. Parker Drilling Co., 911 F.2d 191, 195-96 (9th Cir.1990) (original emphasis) (quoting Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944)), cert. denied, --- U.S. ----, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). The majority, I fear, casts aside this important principle today.
 
 
 
 [1]
 To the extent that plaintiffs are asking us to look to the employee handbook to support their claims, we note that no provision in the handbook modified the employer's right to fire employees at will. See Sands Regent v. Valgardson, 105 Nev. 436, 777 P.2d 898, 899 (1989); Smith v. Cladianos, 104 Nev. 67, 752 P.2d 233, 235 (1988). Plaintiffs offered no objective evidence to support a jury finding that the handbook became part of any employment contract. See D'Angelo v. Gardner, 107 Nev. 704, 819 P.2d 206, 209-11 (1991)
 
 
 [2]
 Plaintiffs cite no case in support of their argument that longevity of service can rebut the at-will presumption in Nevada. Indeed, other states have held that longevity of service cannot convert an at-will contract into one providing for termination only for cause. See Roberts v. Atlantic Richfield Co., 88 Wash.2d 887, 568 P.2d 764, 769 (1977) (en banc)
 
 
 [3]
 The dissent argues that the preceding evidence, although insufficient as a matter of Nevada law to establish an implied contract of employment, was nevertheless "properly considered by the jury because the collective evidence raised a question of fact whether the at-will presumption had been rebutted, even if some of the evidence, considered in isolation, would have been insufficient." Dissent at 770 (emphasis in original). With due respect to our dissenting colleague, we cannot agree that the confluence of several factors, none of which is by itself sufficient to establish the existence of an employment contract, can establish such a contract when aggregated. We read the Nevada Supreme Court's cautious language that a certain factor does not "in and of itself," Vancheri, 777 P.2d at 369, establish an employment contract to mean only that such evidence is relevant and, when coupled with a factor that can establish a contractual relationship, add probative weight to the plaintiff's case. A contract is, after all, a legal relationship which requires a meeting of the minds between the contracting parties. Individual factors that do not, as a matter of law, establish such a meeting of the minds cannot, by some peculiar alchemy, create a legally binding relationship when combined with each other
 
 
 [4]
 In these and the following excerpts from the trial testimony, emphasis has been supplied
 
 
 [5]
 The dissent relies partially on statements made by management long after these employees were hired at Hilton. See dissent at 773-775. All of these statements--from meetings following the fire, the St. Patrick's Day massacre and the 1983 management firings--are consistent with the at-will nature of the plaintiffs' employment. If encouraging employees to stay on board after a shakeup or tragedy gives rise to for-cause contracts with all those employees who stay, employers will have to stop giving routine pep talks. Furthermore, while the terms of employment may be changed during the time of employment--for example, a previously at-will employee might be given an employment contract--the plaintiffs' theory in this case was that they were covered by an implied contract from the date they were hired. In closing argument, for example, plaintiffs' counsel focused on "what the evidence was as to just what the understanding was, what the meeting of the minds was, between these men and Hilton back in 1970 and '71 when it bought the International." RT XLVII 31 (emphasis added). Because no reasonable jury could have found an agreement at that time, the later expressions by management are irrelevant to the issues before us
 
 
 [6]
 Nevada law recognizes two torts related to employment termination: Bad faith discharge, which is based on firing the employee in violation of the implied covenant of good faith and fair dealing in the employment contract, and tortious discharge, which is based on firing the employee in violation of public policy. D'Angelo, 819 P.2d at 211-12. In the absence of an employment contract, a plaintiff can recover only under the latter theory. Id. at 216. "The prototypical tortious discharge case is [Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984) ], in which an employee claimed to have been discharged to penalize him because he had filed a workers compensation claim." Id. No such conduct is alleged in this case. In fact, the Nevada Supreme Court has "refused to recognize an action for tortious discharge even though the defendant had clearly violated Nevada's public policy against age discrimination." Id. 819 P.2d at 216-17 (citing Sands Regent, 777 P.2d at 900). In any event, "[n]o public policy tort was pursued by Plaintiffs." Supplemental Brief of Appellees/Cross Appellants at 9. Plaintiffs cannot recover for tortious discharge
 
 
 [7]
 Because plaintiffs were not entitled to any damages for breach of contract or bad faith discharge, we need not address their argument that they should have been awarded emotional distress damages for bad faith discharge
 
 
 [8]
 The California Supreme Court will soon consider the issue for the first time. Lanouette v. Ciba-Geigy Corp., 230 Cal.App.3d 889, 272 Cal.Rptr. 428, review granted, 29 Cal.3d 615, 275 Cal.Rptr. 420, 800 P.2d 898 (1990)
 
 
 [9]
 We need not address Hilton's argument that the award of prejudgment interest on the emotional distress damages was improper under Nevada law. As we have struck down the damages award, the prejudgment interest falls with it
 
 
 [10]
 This sanction was equivalent to dismissing Foltz's lawsuit, a sanction we have held must be applied sparingly. See Campbell v. Gerrans, 592 F.2d 1054, 1058 (9th Cir.1979) ("The sanction of judgment by default for failure to comply with discovery orders is the most severe sanction which the court may apply, and its use must be tempered by careful exercise of judicial discretion to assure that its imposition is merited," quoting Trans World Airlines v. Hughes, 332 F.2d 602, 614 (2d Cir.1964), cert. dism'd, 380 U.S. 248, 85 S.Ct. 934, 13 L.Ed.2d 817 and 380 U.S. 249, 85 S.Ct. 934, 13 L.Ed.2d 818 (1965).)
 
 
 [11]
 The court, rather than the jury, made this factual finding because the court awarded compensation for lost retirement benefits as an equitable remedy in the Title VII action, after the jury verdicts came in. CR 493, at 2-3. The court decided that the "equitable method for awarding Plaintiffs lost retirement benefits [was] to utilize the existing provisions of the Hilton Hotels' Retirement Plan." Id. at 3
 
 
 [1]
 In the excerpts that follow, the emphases are mine
 
 
 [2]
 See 819 P.2d at 210 ("A jury could have concluded that both employer and employee intended to be bound by the terms of the handbook; but the jury could, of course, have concluded otherwise and decided in favor of GEMCO.")
 
 
 [3]
 Vancheri actually held that "general expressions of job longevity and advancement, and the established disciplinary procedure as described in this case, are not, as a matter of law, sufficient to establish a prima facie case rebutting the at-will employment presumption." Id. 777 P.2d at 370 (emphasis added). This qualifier is significant, because it was unclear in Vancheri whether the disciplinary procedure even applied to the plaintiff, who was in a management position. Id. at 369. It would be inappropriate for us to construe this holding more broadly, to mean that all disciplinary procedures, as a matter of law, are insufficient to rebut the at-will presumption. See, e.g., D'Angelo, 819 P.2d at 212-13 (inclusion of detailed disciplinary procedures in employer handbook supported finding of for-cause relationship)