JAMES H. HALE, APPELLANT, *v.* RIVERBOAT CASINO, INC., DBA HOLIDAY CASINO, RESPONDENT.

No. 14481

May 15, 1984                                    682 P.2d 190

[Rehearing denied August 27, 1984]

*Galatz, Earl & Catalano,* Las Vegas, for Appellant.

*Cromer, Barker, Michaelson, Gillock & Rawlings,* and *Janice J. Brown,* for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

This is an appeal from an order granting a new trial. Appellant, James R. Hale (Hale), brought suit to recover damages caused by respondent Riverboat Casino, Inc. (Riverboat). The jury favored him with its verdict following a four-day trial. Riverboat moved for a new trial, alleging juror misconduct and excessive punitive damages. The district court initially ordered a new trial unless Hale accepted a reduction in the amount of damages. Before Hale could accept the remittitur, the district court *sua sponte* ordered an unconditional new trial.

Hale appeals this order arguing that there was no juror misconduct and that the damages were not excessive. We agree and reverse, reinstating the jury verdict.

### THE FACTS

On May 23, 1977, Hale was in Las Vegas attending a Far West Regional Conference sponsored by the National Teacher Corporation. Hale came with a group from Portland, Oregon. He holds a doctoral degree, and had been a professor at Portland State University for more than twenty-one years, where he was administrator of the teacher education program. The following narrative is drawn from the testimony in support of the jury's verdict.

On the evening of May 23, 1977, Hale and three members of his regional group played keno at the Holiday Casino, owned by respondent Riverboat. Someone nearby noticed a wallet next to Hale's chair, and pointed it out. Hale saw the wallet on the floor next to his foot, and a man standing beside him reached down and handed it to him. Hale inquired of his companions, but none of them owned the wallet. Hale searched for identification. He found no identification, but did discover several hundred dollars in United States and Canadian currency, a shopping list and a mongram on the wallet itself. The wallet appeared to be a woman's wallet.

Hale reported his discovery to the keno window. A security guard soon appeared in the keno lounge area, and Hale waved him over. Hale explained what had occurred. The guard simply said: "Okay, give me the billfold." Hale reiterated his story, suggesting that perhaps the guard could make an announcement and have the owner come and identify it. According to Hale, the guard simply said: "I can't do that;" then he stuck out his hand and said: "Give me the wallet," or "Give me the

money.'' The guard left after Hale refused to hand over the wallet and Hale resumed playing keno. Sometime later, Hale repeated the story to a second security officer, again asking whether an announcement could be made. The security officer merely responded that he'd ''better give it to Fitzgerald,'' the first guard. Hale expressed concern over dealing with the first guard, whom he described as acting in an ugly and threatening manner.

Sometime later, Fitzgerald returned to where Hale was playing keno and demanded that Hale move to the perimeter of the lounge area. After a joking response, Hale complied. Once they were separated from the keno lounge by a bank of slot machines, Hale testified that the guard backed him into the slot machines and demanded: ''Give me the money.'' Hale asked for some assurance that the wallet would be returned to the owner, or that an announcement be made. According to Hale ''he got his finger down in my face and he called me stupid-ass boy, and he told me I was going to get myself in a lot of trouble if I didn't give him that money and said he was going to call Metro.'' Hale refused to surrender the wallet without assurances, and he rejoined his friends.

Soon Hale was introduced to a new officer, who was a member of the Las Vegas Metropolitan Police Department. Hale repeated his story and his concern. The officer suggested that Hale give the wallet to him, or turn it over to the first guard. When Hale refused to do so, without assurances, the officer read him the Trespass Act, while the first guard said he had ''better not try to leave.'' It was then suggested that they all go upstairs and settle the matter. Hale consented, so long as his friends could accompany him.

The guards surrounded Hale and proceeded upstairs to an office. They entered the office and the door was slammed shut and locked with Hale's friends outside, banging on the door and attempting to talk to the guards. Hale was ordered to sit. The wallet was again demanded, and Hale again requested assurance that it would be returned to its rightful owner. Hale testified that someone said: ''Get up,'' so he stood, and was told to put his hands behind his back. He did not know how many guards were in the room, but at least four of them came toward him and one of them said: ''Let's teach this guy a lesson.'' They grabbed his wrists and took his glasses out of his pocket. Then Hale testified that the guards yanked him out of the corner, pulled his arms over his head, handcuffed him and threw him back into the chair. They then took the billfold out of his pocket and sat down and began counting the money.

Hale asked to see a manager. He testified at this point that a man wearing a suit came forward, leaned down and said: "I am the manager and you are going to get just what you deserve," and walked out of the office. Hale pleaded with the guards to take the handcuffs off. One of the guards leaned down and said that Hale had called him a name, and "no one has ever gotten away with that."

Meanwhile, one of Hale's colleagues was rapping on the office window, calling out that the woman who had lost the wallet was there. Some of the guards left the office, apparently to return the wallet. The others got Hale up, saying: "Come on, we are going downtown." As Hale passed out of the office with the guards he saw a woman, crying, and expressed his gratification that she had her wallet back. Then Hale and the guards proceeded downstairs, and through the casino, Hale handcuffed and surrounded. The police officer put Hale in a car and drove him downtown. He informed Hale that Fitzgerald had made a citizen's arrest at the casino.

Hale was booked for disorderly conduct and obstructing a public officer. Despite his offer of cash bail, he was stripped, body searched, sprayed for lice and placed into a crowded holding cell. He was fingerprinted and photographed in jail coveralls. Several hours later he was released onto the street, with a check in place of the cash that had been in his wallet. Fortunately, he met his friends, and returned with them to his hotel.

Knowledge of his arrest became widespread among participants in the conference. He was called upon to give an explanation to the entire group from Oregon, but faltered so from humiliation that a colleague had to intercede and explain.

When Hale returned to Portland he was required to seek medical attention for a back sprain which had occurred when the guards had pulled his arms. The pain persisted for two to three months thereafter. Hale also testified that his standing and reputation had been injured and that his educational consulting business had declined dramatically since the arrest.

Respondent pursued prosecution of Hale, and until the charges were resolved he felt unable to attend other conferences where he might encounter persons from the Las Vegas conference. Hale had to return to Las Vegas to defend the charges in a two-day trial. This required retaining counsel and borrowing money to pay witnesses for flying to Las Vegas from various parts of the country. He was acquitted after a two-day trial.

Hale brought the instant suit against Riverboat, acting

through its agents and employees, for negligence, assault and battery, false imprisonment, malicious prosecution, defamation, and negligent and/or intentional infliction of emotional distress. In his Amended Complaint Hale sought punitive, as well as compensatory damages.

After a four-day trial and approximately two hours of deliberations, a unanimous jury verdict was reached in favor of Hale and against Riverboat as follows: compensatory damages were awarded in the amount of $2,100 and punitive damages in the amount of $97,900 for a total assessment of $100,000.

Thereafter, Riverboat brought motions to "Recall Jurors to Order Background Checks on the Jury Panel," and for "New Trial and/or Remittitur." Opposition to these motions was filed by Hale. Approximately five months later the district judge denied Riverboat's Motion to Recall Jurors and ordered that Riverboat be granted a new trial if, within twenty days, Hale did not consent to the following: increasing the compensatory damage award from $2,100 to $8,000, and reducing the punitive damage award assessment from $97,900 to $30,000; *i.e.,* modifying the total jury assessment from $100,000 to $38,000. Later, on the nineteenth day after this decision, the trial judge informed counsel for both parties that he was going to vacate his order reducing the jury verdict and granted Riverboat a new trial. This appeal followed.

### JUROR MISCONDUCT

Riverboat alleges that a juror's failure to reveal a prior arrest during the voir dire examination constituted misconduct that justified the order for the new trial. We disagree.

Riverboat brought its charge of misconduct predicated upon affidavits of its counsel and a single juror, Muriel Hines. Juror Hines' affidavit alleged that two unidentified jurors indicated during their deliberations that they had been previously arrested. She could not remember the two jurors' names. The affidavits of Riverboat's counsel indicated that one juror had been arrested on a traffic warrant.

The trial judge then, *sua sponte,* investigated the arrest records of all eight jurors using a computer system operated by the Las Vegas Metropolitan Police Department. He revealed this to counsel at the hearing on the Motion for a New Trial and indicated that juror Campanella had been less than truthful during voir dire.

Riverboat alleges that there was juror misconduct requiring a

new trial because juror Campanella failed to reveal a prior arrest during voir dire examination. To constitute misconduct, the failure of a juror to answer a question touching upon his qualification must amount to intentional concealment. *See* Walker v. State, 95 Nev. 321, 323, 594 P.2d 710, 711 (1979); Walkowski v. McNally, 87 Nev. 474, 476, 488 P.2d 1164, 1165 (1971). To justify a new trial, the misconduct must be prejudicial, that is, it must have improperly influenced the jury or tainted its verdict. *See Walker,* 95 Nev. at 323, 594 P.2d at 711; *see also* Barker v. State, 95 Nev. 309, 594 P.2d 719 (1979).

Ordinarily, the determination of the question of intentional concealment is left with the sound discretion of the trial court. *Walker,* 95 Nev. at 323, 594 P.2d at 711; McNally v. Walkowski, 85 Nev. 696, 701, 462 P.2d 1016, 1019 (1969). But unless the evidence supports the court's decision, that discretion is abused, and its exercise must be reversed.

During voir dire examination of the jury, the trial court asked the veniremen:

> Is there anybody here, and I don't ask these questions to embarrass you, but are there any of you who have been subject to an arrest other than traffic violations and things like that?

Juror Campanella did not respond. His affidavit reveals that six weeks prior to trial he had had a termination problem with his employer and had unlawfully removed a typewriter from his employer's premises. The police were informed, and he received a call from a detective, who gave him the choice of turning himself in to the police, or being arrested. The juror chose to turn himself in, and after the trial of the instant case received probation. His affidavit shows that he did not think he had been "arrested," and believed the trial court in its question meant an involuntary apprehension or incarceration with physical resistance.

Juror Campanella's affidavit stands uncontradicted. It does not support a conclusion of intentional concealment. If he reasonably understood the question during voir dire to exclude his particular experience from the category "arrest," he cannot be said to have intentionally concealed that experience in failing to respond. We note that although "arrest" is statutorily defined, *see* NRS 171.104, this Court has nevertheless been called upon to construe the term. *See* A Minor v. State, 91 Nev. 456, 463, 537 P.2d 477, 481 (1975). A layman's confusion is reasonable under such facts.

As the Supreme Court of the United States recently held:

> To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give, McDonough Power Equipment v. Greenwood, 42 U.S.L.W. 4126, 4128, 104 S. Ct. 845, 850, ...... U.S. ...... (1984).

The trial court abused its discretion in granting a new trial under the circumstances presented in this case.

### DAMAGES

In support of its motion for a new trial, Riverboat argued that the punitive damages were excessive. Hale contends on appeal that the punitive damage award of $97,900 was not so excessive as to justify a new trial. We agree.

Recently, we reiterated the general rule regarding the award of excessive punitive damages:

> Heretofore, we have recognized the subjective nature of punitive damages [citation omitted] and the absence of workable standards by which to evaluate the propriety of such an award. Accordingly, we have allowed that determination to rest with the discretion of the trier of the fact [citation omitted] unless the evidence introduced at trial shows that the amount awarded by the jury would financially destroy or annihilate the defendant [citation omitted] in which event we would attempt an appropriate adjustment of the award.

Bull v. McCuskey, 96 Nev. 707, 711, 615 P.2d 957, 961 (1980). *See also* Summa Corp. v. Greenspun, 98 Nev. 528, 535-36, 655 P.2d 513, 517 (1982) (one million dollars not excessive in light of defendant's net worth).

The award should not be disturbed unless it is so large as to appear "to have been given under the influence of passion or prejudice." NRCP 59(a)(6). A large award alone does not conclusively indicate that passion and prejudice influenced the trier of fact. Nevada Cement Co. v. Lemler, 89 Nev. 447, 453, 514 P.2d 1180, 1184 (1973). The amount of an award need not be proportional to the amount of compensatory damages. Northern Nev. Mobile Home v. Penrod, 96 Nev. 394, 610 P.2d 624 (1980); Randono v. Turk, 86 Nev. 123, 466 P.2d 218 (1970).

Rather, punitive damages are authorized "for the sake of example and by way of punishing the defendant." NRS 42.010. *See* Northern Nev. Mobile Home v. Penrod, *supra;* Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962).

In the case at bar the facts regarding Riverboat's culpability are essentially undisputed. The security guards' acts were inexcusable. Hale conscientiously attempted to assure the return of the lost wallet. For his concern he was harassed, threatened, imprisoned and manacled after being physically assaulted. Hale was then escorted to jail in handcuffs, booked and held in jail for a good portion of the night. Riverboat's employees participated in Hale's prosecution, causing him not only the ignominy of a criminal trial, but also the incurrence of substantial expense.

The award in this case at the time of the jury verdict amounted to less than 1.5 percent of Riverboat's annual net profit, and less than ½ percent of its net worth. It is clear that the award will not financially destroy or annihilate Riverboat.

The amount of damages was not large nor excessive, in view of Riverboat's net worth. Our judicial conscience is not shocked. For these reasons we find that the trial judge abused his discretion in ordering a new trial.

We accordingly reverse the order for a new trial and we reinstate the jury verdict.

MANOUKIAN, C. J., and SPRINGER, STEFFEN, and GUNDERSON, JJ., concur.