L. S. SHOEN, Appellant, *v.* AMERCO, INC.,
a Nevada Corp., Respondent.

No. 24461

May 25, 1995 896 P.2d 469

[Rehearing denied October 19, 1995]

Law Office of *Daniel Marks and Keith M. Lyons,* Las Vegas, for Appellant.

*Jimmerson, Davis & Santoro,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

Appellant Leonard S. Shoen (Shoen) entered into an employment contract with respondent Amerco, Inc. (Amerco), of which Shoen was the founder. The contract provided Shoen with employment for seven years, and an option to renew the contract for three subsequent seven-year periods. The contract further provided that it was the intent of the parties to provide Shoen with the right to be employed by Amerco for his lifetime. After seven years, Amerco terminated Shoen. Shoen sued Amerco for breach of contract, tortious breach of contract in violation of public policy, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, and negligent infliction of emotional distress. The district court granted summary judgment on all claims. For the reasons stated below, we reverse and remand for trial on all claims except tortious breach of contract.

### FACTS

This dispute centers around an employment contract entered into by Shoen and Amerco, a Nevada corporation. Amerco was created in 1969 as the holding company for all companies comprising the U-Haul Rental System. Shoen founded the original U-Haul company in 1945. He managed the business for over forty-one years, turning the small company into a multi-product organization having an estimated net worth of $4.4 billion. Shoen served as President and Chairman of the Board of Directors of Amerco from its inception until 1986.

As the U-Haul company grew, Shoen began making gifts of his holdings to his children. Approximately 92 percent of Amerco's stock is now owned by Shoen's children. Shoen's four oldest sons each own approximately 10 percent of Amerco's stock, while the younger children own greatly decreasing amounts. Shoen's allegations in the instant case involve the actions of his sons, Edward J. Shoen (Joe) and Mark V. Shoen (Mark), in their capacity as officers and directors of Amerco. Joe has been President and CEO of Amerco for the past seven years and Mark has been a member of the Board of Directors for over twenty years.

On December 27, 1979, at the age of fifty-nine, Shoen entered into an employment contract with Amerco. When the parties executed the agreement, Shoen was President and Chairman of the Board of Amerco. The contract provided that Shoen was to be employed "for a period of 6 years, 11 months, and 30 days,

beginning on January Two, 1980 and ending on January One, 1987.'' Shoen had the option to renew the contract for three additional six year, eleven month, and thirty day periods by giving Amerco written notice of intent to renew within thirty days of the expiration of the then current period of employment. Immediately following the provision for renewal, the contract stated that it was ''the intention of the parties hereto to provide the Employee with the right to be employed by the Employer for the Employee's lifetime.'' The contract could be terminated only upon the mutual written agreement of both parties, by Shoen's death, or by Shoen's intentional failure to renew the contract at the end of a specific employment period. Shoen's salary was $300,000.00 a year, subject to cost of living adjustments.

The contract further provided that Shoen's duties would consist of serving in any capacity directed by Amerco, and being at all times subject to the plans and policies of the Amerco board of directors. Shoen was prohibited from providing services to any business competing with Amerco or its subsidiaries. Further, the contract characterized Shoen's services as unique and unusual, allowing Amerco to seek equitable relief to prevent breach of the agreement.

Shoen continued to serve as President and Chairman of Amerco after signing the contract until 1986, when Shoen informed Amerco by letter of his decision to retire.[1] Shoen stated that he planned to continue serving Amerco as a consultant pursuant to the terms of the contract, which provided that in the event of Shoen's retirement or inability to perform due to disability, Shoen should ''reasonably perform as a consultant to the officers and members of the Board of Directors of the company.'' Additionally, at this time, Shoen informed Amerco of his election to renew the contract for a second seven years, ''as well as [his] election to renew the Contract every subsequent seven years in accord with the intention of the contract to provide for [his] employment and compensation for [his] lifetime.'' Shoen continued to be compensated pursuant to the terms of the contract.

In approximately February, 1987, Shoen asserted that he was unable to perform his consulting and guidance duties for Amerco, and began receiving disability compensation pursuant to the contract. In 1988, the Board gave Shoen a cost of living increase.

Shoen was informed in a letter from Amerco dated February

---

[1]Shoen's deposition and affidavit indicate that this ''retirement,'' at least from the Chairmanship of the Board of Directors, was not voluntary. Joe and Mark allegedly solicited the proxies of their siblings and voted Shoen and a twelve man board of directors out—replacing them with a four man board consisting of Shoen's four oldest sons. Joe was elected Chairman of the Board, and subsequently took over as President of Amerco.

20, 1989, that he had breached the employment contract and that his "compensation [was] therefore being immediately stopped." Amerco stated that it had learned that Shoen had testified under oath that he did not suffer from bipolar affective disorder, though he had been compensated by disability salary for such a disorder since February, 1987.[2] Amerco further stated: "If you are not disabled, your past failure to act in the best interest of your employer constituted a breach of your Employment Contract and your compensation is therefore being immediately stopped." In closing, Amerco stated that if Shoen could controvert his testimony by a physician's certificate, he should provide this to the company for consideration. The letter was signed by Joe, as President and CEO of Amerco.

Shoen contends that the real reason for his termination was his testimony against Joe in an IRS tax trial in Phoenix, Arizona, on February 6, 1989, for which Shoen was subpoenaed to testify. Shoen alleges that though he was not notified of his termination until February 20, his disability compensation was actually discontinued on Sunday, February 5, 1989—the day before he testified regarding Joe's activities in a corporation named Form Builders, which was eventually found liable for a large sum of unpaid federal income tax. Shoen further alleges that prior to and immediately after testifying at this trial, he was assaulted and harassed by his son Mark, a member of Amerco's Board of Directors, who faced similar income tax consequences from the trial.

On September 24, 1989, Shoen filed a complaint alleging that Amerco had: (1) breached the employment contract by terminating him; (2) tortiously discharged him in retaliation for testifying at an IRS trial in Phoenix, Arizona; (3) breached the implied covenant of good faith and fair dealing; (4) intentionally inflicted emotional distress by terminating him; and (5) negligently inflicted emotional distress by terminating him. Shoen requested punitive damages.

Amerco asserted that Shoen had breached the employment agreement, and that Amerco had acted in good faith in terminating Shoen. On August 27, 1991, Amerco filed a motion for partial summary judgment on Shoen's claims for breach of contract, tortious discharge, and bad faith discharge. Amerco asserted that the contract was for lifetime employment, that lifetime contracts are indefinite and unenforceable, and that accordingly, Shoen was terminable at will. The district court, noting that Shoen had testified in his deposition that the contract

---

[2]It is unclear from the record when and where Shoen testified as alleged in this letter.

was intended to be for the rest of his life and was renewable at his option, granted summary judgment in favor of Amerco on the first three causes of action.

On November 16, 1992, Amerco filed a motion for partial summary judgment on Shoen's claims for intentional and negligent infliction of emotional distress. Amerco argued that such claims were not recognized in the employment termination context, and that Nevada does not recognize a direct cause of action for negligent infliction of emotional distress. The district court granted Amerco's motion for summary judgment on the emotional distress claims, and on Shoen's claim for punitive damages. Shoen appeals from both grants of summary judgment.

## DISCUSSION

### Standard of Review

Summary judgment is appropriate only where there is no genuine issue of material fact remaining and the moving party is entitled to judgment as a matter of law. Sawyer v. Sugarless Shops, 106 Nev. 265, 267, 792 P.2d 14, 15 (1990). The evidence must be construed in the light most favorable to the nonmoving party, and all of the nonmovant's statements must be accepted as true. *Id.* at 267-68, 792 P.2d at 15.

### Breach of Contract

The district court granted summary judgment for Amerco on Shoen's breach of contract claim based on its determination that Shoen's contract with Amerco was for lifetime employment, that contracts for lifetime employment are unenforceable as a matter of law, and that, as a result, Shoen's employment was at-will. We hold that the district court erred in concluding that a contract for lifetime employment is unenforceable in these circumstances.[3]

Amerco argues that the general rule supported by a substantial number of jurisdictions is that a contract calling for "lifetime" employment amounts to employment for an indefinite duration, terminable at the will of either party. Amerco asserts that in Nevada, it is a well-settled principle that "employment for an

---

[3]We conclude that no genuine issue of fact exists regarding whether the contract was for a term of years, or was for Shoen's lifetime. The contract states that it was "the intent of the parties to provide the employee with employment for a lifetime," and Shoen's undisputed testimony was that the contract was intended to provide him with employment for life. Thus, the district court did not err in determining that the contract in the instant case was for lifetime employment.

indefinite term may be terminated at any time for any reason or for no reason by either the employee or the employer without legal liability." In support of this argument, Amerco cites Bally's Grand Employees' Federal Credit Union v. Wallen, 105 Nev. 553, 557, 779 P.2d 956, 958 (1989), in which this court determined that certain testimony described an agreement of employment for an indefinite term, characteristic of an at-will relationship.

Generally, courts have found that "lifetime" contracts are at-will for reasons other than the indefinite nature of such a contract:

> [W]here the employment is "permanent" or "for life" the majority of courts interpret this as being an agreement at will, terminable by either party at his election. Deeming such agreements to be at variance with general usage and sound policy, the courts have shown a marked reluctance to enforce contracts for life employment. In large part, this stems from the realization that such contracts frequently are, in practical effect, unilateral undertakings by the employer to provide a job for so long as the employee wishes to continue in it but impose no corresponding obligation upon the latter. When this is the case, the burden of performance is unequal as the employer appears to be bound to the terms of the contract whereas the employee is free to terminate it at will.

9 Samuel Williston, Williston on Contracts § 1017, at 131-32 (W. Jaeger ed., 1967) (footnotes omitted).

If, however, the employee provides consideration in addition to the promise to render services incidental to employment, courts have held that a contract for permanent or lifetime employment is enforceable. *Id.* at 132-33; *see* Murphree v. Alabama Farm Bureau Ins. Co., 449 So. 2d 1218, 1221 (Ala. 1984) (a contract for permanent employment is enforceable when the employee provides consideration other than a promise to render services, such as when the employee relinquishes a claim against the employer, or gives up other employment to work under a new contract).

Amerco argues that because this contract was clearly Shoen's "retirement deal," it is one lacking in mutuality of obligation and is illusory and unenforceable. The court in Osborne v. Locke Steel Chain Co., 218 A.2d 526, 533 (Conn. 1966), a factually analogous case, rejected a similar argument. The plaintiff in *Osborne* had been president of the defendant company and a member of the board of directors for seventeen years. *Id.* at 529. Like Shoen, he entered into a lifetime contract, agreeing to hold himself available for consultation and advice with the company and its officers, and not to engage in or be employed by any

competitor of the company. *Id.* at 528. The plaintiff was seventy years old when the contract was executed, and seventy-four at the time of trial. *Id.*

The *Osborne* court rejected the trial court's conclusion that there was no consideration for the agreement on the plaintiff's part, stating that the plaintiff's promise to hold himself available for consultation and avoid serving any company in competition with the defendant constituted a clear benefit to the defendant. *Osborne*, 218 A.2d at 529-30. The court noted that the plaintiff's agreement to avoid serving any other company constituted a detriment to the plaintiff, therefore providing *additional* consideration. *Id.* The court further noted that the contract could not continue for an unreasonable length of time in view of the plaintiff's age, stating that "lifetime" employment certainly meant a limited period of time under the circumstances. *Id.* at 533.

We agree with the reasoning of *Osborne*. Shoen's promises to hold himself available as a lifetime consultant and not to provide any services to companies competing with Amerco constitute a benefit to Amerco and a detriment to Shoen, so that the contract is not illusory. Additionally, Shoen was fifty-nine years old when he entered into the contract. He continued to serve as Amerco's president and chairman of the board until the age of sixty-six in 1987, when he was allegedly forced to retire by his sons. We agree with the *Osborne* court's statement that a "lifetime" is not an unreasonably lengthy or indefinite period of time for the contract to run in such circumstances.

Moreover, we note that courts have upheld agreements for permanent or lifetime employment *without* requiring extra consideration "where the court is convinced that it was the intent of the parties to enter into such long-range commitments" and where the long-range commitments are "specifically and definitely expressed." 9 Samuel Williston, Williston on Contracts § 1017, at 132 (W. Jaeger ed., 1967).

In Drzewiecki v. H & R Block, Inc., 101 Cal. Rptr. 169 (Ct. App. 1972), for example, the court considered a written contract stating that employment was automatically renewable on a year-to-year basis unless either party gave ninety days written notice of its intention to terminate. The contract provided that the employer could give termination notice only if the employee improperly conducted business. While acknowledging the general rule that contracts for lifetime or permanent employment are invalid unless consideration in addition to the services to be performed can be shown, the court stated:

> "If it is their purpose, the parties may enter into a contract for permanent employment—not terminable except pursuant

to its express terms—by stating clearly their intention to do so, even though no other consideration than services to be performed is expected by the employer or promised by the employee. The meaning of the cases previously referred to is that where no such intent is clearly expressed and, absent evidence which shows other consideration than a promise to render services, the assumption will be that—even though they speak in terms of 'permanent' employment—the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party."

*Id.* at 173 (quoting Littell v. Evening Star Newspaper Co., 120 F.2d 36, 37 (D.C. Cir. 1941)); *accord* Minihan v. American Pharmaceutical Ass'n, 812 F.2d 726, 727 (D.C. Cir. 1987) (it is well settled in the District of Columbia that in the absence of clearly expressed contrary intent, even though the parties speak in terms of permanent employment, the parties have in mind merely the ordinary contract for continuing employment that is terminable at will); American Standard, Inc. v. Jessee, 258 S.E.2d 240, 243 (Ga. Ct. App. 1979) (court stated that *"in the absence of a controlling contract,"* contracts for permanent or life employment are indefinite and at will); Pinsof v. Pinsof, 438 N.E.2d 525, 528 (Ill. App. Ct. 1982), (court refused to enforce written contract on grounds that the language "[did] not evince an intention to enter into a commitment for lifetime employment").

In the instant case, there is a written contract specifically stating that the parties intended to provide Shoen with lifetime employment. Thus, the rationale that an at-will agreement was intended cannot apply. Additionally, employment contracts, like other agreements, should be construed to give effect not only to the intention of the parties as demonstrated by the language used, but to the purpose to be accomplished and the circumstances surrounding the execution of the agreement. *Drzewiecki,* 101 Cal. Rptr. 169, 174 (Ct. App. 1972). Given that Shoen was Amerco's founder and was of an advanced age, it seems clear that this contract was Shoen's "retirement deal." Shoen had built Amerco and allowed his children to step into leadership positions in what was a very profitable company. Shoen had knowledge of Amerco and agreed to make himself available for consultation and not to compete. We see no reason for holding that a lifetime contract for employment is not enforceable in this situation. Accordingly, we conclude that the district court erred in granting Amerco summary judgment on Shoen's breach of contract claim.

*Tortious Discharge*

The district court apparently granted summary judgment for Amerco on this claim based on an acceptance of Amerco's argument that an action for tortious discharge is precluded if an employee is at-will. Shoen asserts that the district court erred, arguing that an action for tortious breach of contract is not predicated upon a contract for continued employment.

In D'Angelo v. Gardner, 107 Nev. 704, 718, 819 P.2d 206, 212 (1991), we stated that "[t]he essence of a tortious discharge is the wrongful, usually retaliatory, interruption of employment by means which are deemed to be contrary to the public policy of this state." Moreover, we noted that although " 'a public policy tort cannot ordinarily be committed absent the employer-employee relationship, the tort, the wrong itself, is not dependent upon or directly related to a contract of continued employment . . . .' " *Id.* (quoting K Mart Corp. v. Ponsock, 103 Nev. 39, 46, 732 P.2d 1364, 1369 (1987)).

In the instant case, such a conclusion is not necessary for a reversal of summary judgment on this claim, as we have determined that Shoen has an enforceable contract for lifetime employment. We conclude, however, that a public policy tort should not be recognized in this case based on the fact that a comprehensive statutory remedy exists.

In Sands Regent v. Valgardson, 105 Nev. 436, 439-40, 777 P.2d 898, 900 (1989), we refused to recognize an action for tortious discharge even though the defendant had violated Nevada's public policy against age discrimination because the plaintiffs had already recovered tort damages under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 and under NRS 613.310. In contrast, in *D'Angelo,* 107 Nev. at 721-22, 819 P.2d at 218, we held that appellant Jones was entitled to pursue an action for tortious discharge against his employer because we concluded the statutory remedy provided in NRS Chapter 618, dealing with occupational safety and health, was far less comprehensive than the one in *Valgardson.* The statutory remedy did not allow victims to bring suit to recover tort-type damages for injuries, but simply provided for an action by the administrator of the division of occupational safety and health for reinstatement and past wages, not general damages. *Id.*

Shoen alleges that he was wrongfully terminated by Amerco as a result of testifying in the tax case. As Amerco argues, NRS 50.070, which prohibits employers from terminating an employee who is summoned to serve as a witness in any proceeding, provides Shoen with an adequate tort-type remedy that makes it unnecessary to allow a claim for tortious discharge.

Shoen argues that NRS 50.070 is far less comprehensive than was the statutory remedy provided under the ADEA in *Valgardson,* which we held precluded the plaintiff from seeking tort damages. NRS 50.070(2)(c) provides for reinstatement, recovery of lost wages and benefits, recovery of attorney's fees, and recovery of "[d]amages equal to the amount of the lost wages and benefits." The statutory remedy in *Valgardson* allowed the plaintiffs to recover lost wages and benefits, plus liquidated damages in the same amount. Thus, NRS 50.070 provides for the same amount of tort-type damages received by the plaintiff in *Valgardson,* which this court found to be sufficient in that case. Accordingly, we affirm the district court's grant of summary judgment on this claim.

## Bad Faith Discharge

The district court apparently granted summary judgment for Amerco on this claim based on its incorrect conclusion that Shoen was an at-will employee, and that a claim for bad faith discharge is precluded if the employee is terminable at-will. *See* Sands Regent v. Valgardson, 105 Nev. 436, 439, 777 P.2d 898, 899 (1989) (a claim for bad faith discharge presupposes that the employee was not dischargeable at-will). Shoen asserts that the district court erred, arguing that the covenant of good faith and fair dealing can be implied in an employment contract for indefinite future employment, such as in the lifetime employment contract that Shoen had with Amerco. We agree.

In D'Angelo v. Gardner, 107 Nev. 704, 819 P.2d 206 (1991), we explained:

> Where the employer-employee relationship becomes analogous to or approximates the kind of "special reliance," trust and dependency that is present in insurance cases, we concluded in *K Mart* that betrayal of this kind of relationship may go "well beyond the bounds of ordinary liability for breach of contract" and may result in the offending party's being held tortiously liable for such perfidy.

*Id.* at 717, 819 P.2d at 215 (quoting K Mart Corp. v. Ponsock, 103 Nev. 39, 48, 732 P.2d 1364, 1370 (1987)). In *D'Angelo,* we rejected Jones' bad faith tort claim, noting that Jones had been employed by Western States for less than two years and was not subjected to misrepresentation and betrayal by his employer. In doing so, we noted that Jones' situation was unlike that of the employee in *K Mart*—who had been a faithful employee for almost ten years, who had been hired "until retirement," and whose contract of continued employment was terminated arbitrar-

ily and by artifice and fraud. *D'Angelo,* 107 Nev. at 717, 819 P.2d at 215.

Shoen's relationship with Amerco is the type of employer-employee relationship which presents the elements of reliance, trust, and dependency found in *K Mart* and present in insurance cases. Shoen founded Amerco, gave Joe and Mark their stock, and created their positions as officers and directors of Amerco. Shoen alleges that his employment was terminated with fraud and malice by Amerco. A betrayal of the kind of relationship Shoen has with Amerco could be found to go well beyond the bounds of ordinary liability for breach of contract. Accordingly, we conclude that Shoen's allegations create a question of fact regarding whether or not Amerco breached the implied covenant of good faith and fair dealing present in his contract for continued employment. Thus, we conclude that the district court erred in granting summary judgment on this claim.

### Intentional Infliction of Emotional Distress

The district court apparently granted summary judgment in favor of Amerco on this claim based on an acceptance of Amerco's argument that Nevada does not recognize an action for intentional infliction of emotional distress in the employment context. Shoen argues that the district court erred in concluding that Brooks v. Hilton Casinos Inc., 959 F.2d 757 (9th Cir. 1992), *cert. denied,* 113 S. Ct. 300 (1992), compels such a result.

In *Brooks,* the Ninth Circuit concluded:

> Even had plaintiffs managed to establish that the terminations were wrongful, Nevada does not recognize a cause of action for intentional infliction of emotional distress in the employment termination context. . . . The [Nevada Supreme Court] declined to address the issue in its most recent employment decision. *D'Angelo,* 819 P.2d at 211, 219 n.13. Since the Nevada Supreme Court has given no indication that the emotional distress cause of action applies in the employment termination context, and the issue is open elsewhere, the district court erred in instructing the jury on this cause of action.

*Id.* at 766 (citations omitted; footnotes omitted).

Shoen argues that *Brooks* is contrary to Nevada law and is not binding on this court. Shoen maintains that the Ninth Circuit misread this court's decision in MGM Grand Hotel-Reno, Inc. v.

Insley, 102 Nev. 513, 729 P.2d 821 (1986). The Ninth Circuit stated that in *MGM Grand,* "the Nevada Supreme Court held only that plaintiff's claim for intentional infliction of emotional distress against his employer for conduct related to his industrial accident claim was not preempted by federal labor law." *Brooks,* 959 F.2d at 766. In *MGM Grand,* this court actually held that "[p]laintiff's cause of action for intentional infliction of emotional distress is also within the jurisdiction of the state court." *MGM Grand,* 102 Nev. at 520, 728 P.2d at 825. Thus, contrary to the Ninth Circuit's holding in *Brooks,* the clear implication of this court's language in *MGM Grand* is that the tort of intentional infliction of emotional distress is recognizable in the employment termination context.

The elements of a cause of action for intentional infliction of emotional distress are: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." Star v. Rabello, 97 Nev. 124, 125, 625 P.2d 90, 91-92 (1981) (citation omitted).

In the instant case, Shoen's allegations, contained in his affidavit, create factual issues as to the outrageousness of Amerco's conduct and to the extent of Shoen's injury. Shoen has alleged that his retirement compensation was discontinued by Joe for the express reason of causing Shoen extreme financial hardship and emotional distress; and that his son Paul, a member of the Amerco Board of Directors, had told Shoen that this litigation was being prosecuted by respondent simply to harass Shoen. Additionally, Shoen alleges that before and after he testified at the IRS hearing, his son Mark verbally threatened him and the IRS agent who accompanied him. Shoen testified at his deposition that after the trial was over Mark attempted to assault them.

Shoen further alleged that Joe knew his decision to terminate Shoen would cause him extreme emotional distress due to the fact that they had undergone psychological counseling together to discuss the emotional problems that the actions of Joe and Mark were causing Shoen. Shoen alleged that he has been diagnosed as "situationally depressed," and is currently receiving psychiatric treatment and taking medication as a result of seeing Amerco destroyed by his sons.

Based on the above allegations, we conclude that material issues of fact remain which preclude a grant of summary judgment on this claim.

*Negligent Infliction of Emotional Distress*

The district court apparently granted summary judgment in favor of Amerco on Shoen's claim of negligent infliction of emotional distress based on the Amerco's argument that in Nevada, this action is limited to "bystander" plaintiffs and does not extend to "direct victims," such as discharged employees.

In Hutton v. General Motors Corp., 775 F. Supp. 1373, 1381 (D. Nev. 1991), the court concluded that Nevada case law indicated that "'unless the plaintiff is a witness to defendant inflicting injury on a close relative of the plaintiff, and suffers physical injury as a result of the incident, plaintiff may not recover'" for negligent infliction of emotional distress. *Id.* at 1381 (quoting Etchart v. Bank One, 773 F. Supp. 239, 244 (D. Nev. 1991)). Amerco argues that because Shoen's claim rests on his suffering as a direct victim, the district court's grant of summary judgment as to his claim for negligent infliction of emotional distress was proper.

An examination of the case law indicates that Nevada has not expressly permitted damages to be recovered for the infliction of emotional distress in a negligence cause of action. If a bystander can recover for the negligent infliction of emotional distress, it is only logical that the direct victim be permitted the same recovery. Many times a tort claim may be based on evidence that presents a close case of whether an intentional or a negligent act was committed. In these cases, the direct victim should be able to assert a negligence claim that includes emotional distress as part of the damage suffered as well as an intentional tort cause of action. Accordingly, we recognize that the negligent infliction of emotional distress can be an element of the damage sustained by the negligent acts committed directly against the victim-plaintiff.

*Punitive Damages*

The only basis for the district court's decision granting summary judgment on this issue is that all causes of action which would entitle Shoen to punitive damages had been decided in favor of Amerco through partial grants of summary judgment. As Shoen has raised allegations of fraud and malice regarding his termination, a reversal of summary judgment on any tort claim entitles Shoen to seek punitive damages at trial. Thus, the district court's grant of summary judgment on Shoen's claim for punitive damages is hereby reversed.

## CONCLUSION

The district court's grant of summary judgment in favor of

Amerco on Shoen's claim for tortious discharge in breach of public policy is affirmed.

We conclude, however, that the district court erred in granting summary judgment in favor of Amerco of Shoen's claims for breach of contract, bad faith discharge, and intentional infliction of emotional distress. We further recognize that emotional distress can be an element of damage recovered by a direct victim in a negligence cause of action. Accordingly, we reverse the district court's grant of summary judgment as to those claims, and remand for trial on the merits, with Shoen being permitted to seek punitive damages.