DILLARD DEPARTMENT STORES, INC., A DELAWARE CORPORATION; AND DILLARD'S NEVADA, INC., A NEVADA CORPORATION, APPELLANTS, v. DELORIS BECKWITH, RESPONDENT,

No. 31378

December 13, 1999

989 P.2d 882

[Rehearing denied February 22, 2000]

*John Peter Lee, Ltd.,* and *Barney C. Ales* and *Paul C. Ray,* Las Vegas, for Appellants.

*Donald J. Campbell & Associates* and *J. Colby Williams,* Las Vegas, for Respondent.

## OPINION

By the Court, LEAVITT, J.:

Deloris Beckwith, sixty-four years of age, was a twenty-five-year employee of Dillard Department Stores (Dillard) and an area sales manager for nineteen years. She injured her back at work and filed a workers' compensation claim. Dillard is a self-insured employer. Beckwith was asked to return to work, but her doctor refused to release her because of her condition. When Beckwith failed to return to work, Dillard filled her job with another manager. Upon her return, Beckwith was demoted to an entry-level sales position with a forty-percent reduction in salary and benefits. She resigned and commenced this action.

### FACTS

Beckwith was an exemplary employee of Dillard who had never received an annual review rating of less than "satisfactory" and most of her reviews rated her "very good" or "outstanding." Her salary was $41,000 per year, and she enjoyed a benefit package that included medical coverage and a retirement plan.

Beckwith strained her back at work while attempting to move a large mahogany table. Her injuries rendered her unable to walk upright or without assistance. A doctor recommended by Dillard certified her as temporarily disabled secondary to acute lumbosacral strain. Another doctor referred by Dillard agreed. The store manager requested that Beckwith return to work prior to her release from the doctor, even though the manager knew she had not been released. Beckwith failed to return to work when requested, and another person was given her position. The store manager later informed her by telephone that she had been replaced.

Beckwith returned to Dillard for light duty work approximately a month after the injury. She was assigned an entry-level position, which included document filing. Thereafter, she was asked to leave a weekly department managers' meeting because she no longer served in a management position. All of the other area sales managers and assistant managers observed Beckwith's humiliation as a result of the incident.

Beckwith was ultimately given two choices, resignation or a permanent entry-level sales associate position with a forty-percent cut in wages and benefits. She accepted the demotion because she was her sole support and needed the medical benefits. Beckwith was assigned to the ladies' ready-to-wear division, one of the most difficult departments in which to make daily sales quotas. If entry-level sales associates did not make their daily quotas, they could be docked part of their pay or be fired. After Beckwith began working in sales, the teenage sales associates would laugh at her behind her back, and additionally, other Dillard employees in the store talked about Beckwith's situation and why she was demoted. At one point when Beckwith walked into the employee lounge at lunchtime, the room went silent and people stared at her. Beckwith twice complained to management about the humiliation she was experiencing and its effect on her health. She finally resigned one week before her twenty-fifth year with Dillard.

At the time Beckwith was released to return to work there were two area sales manager positions open for which she was qualified, but management determined she was not eligible for an area sales manager position, a post she held prior to her demotion. She was notified the demotion was because she took time ''off for workman's [sic] comp.''

Beckwith fell into a depression and was treated by a psychiatrist for a major depressive disorder. She was treated with antidepressant medication and psychotherapy.

After leaving her job, Beckwith filled out applications for employment at several department stores, called friends who

worked at different stores to inquire if any positions were open and consulted a friend who owned an employment agency in attempts to find work. She called Sears and J.C. Penney's to see if they had openings and filled out applications. She also filed an application with Neiman-Marcus. Nothing came of these efforts. At trial evidence was presented that most department stores have a policy to promote from within and for that reason, Beckwith would not have a chance to be hired as a manager at any comparable department store.

The jury awarded $424,028 in compensatory damages on the tortious constructive discharge claim and $200,000 on the intentional infliction of emotional distress cause of action. The jury also awarded punitive damages and after reduction of each claim to three times the compensatory damages the punitive damages totaled $1,872,084. The total damages awarded were $2,496,112. The court also awarded attorney's fees in the amount of $518,455 pursuant to NRS 17.115 and NRCP 68.

## DISCUSSION

*Tortious Constructive Discharge*

Employees in Nevada are presumed to be employed "at-will" unless the employee can prove facts legally sufficient to show a contrary agreement was in effect. Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366 (1989). The at-will rule gives the employer the right to discharge an employee for any reason, so long as the reason does not violate public policy. *Vancheri* at 421, 777 P.2d at 369; K Mart Corp. v. Ponsock, 103 Nev. 39, 47, 732 P.2d 1364, 1369 (1987).

Previously, we have specifically held that "the at-will employment rule is subject to limited exceptions founded upon strong public policy; and the failure of the legislature to enact a statute expressly forbidding retaliatory discharge for filing workmen's compensation claims does not preclude this Court from providing a remedy for what we conclude to be tortious behavior." Hansen v. Harrah's, 100 Nev. 60, 63, 675 P.2d 394, 396 (1984).

Dillard claims a private cause of action for tortious discharge for filing a workers' compensation claim no longer exists in Nevada after the legislature, in 1995, passed NRS 616D.030:

1. No cause of action may be brought or maintained against an insurer or a third-party administrator who violates any provision of this chapter or chapter 616A, 616B, 616C or 617 of NRS.

2. The administrative fines provided for in NRS 616B.318 and 616D.120 are the exclusive remedies for any violation of this chapter or chapter 616A, 616B, 616C or 617 of NRS committed by an insurer or a third-party administrator.

We have recognized:

·"[R]etaliatory discharge by an employer stemming from the filing of a workmen's compensation claim by an injured employee is actionable in tort. Since both the cause of action and the remedy are governed by the law of torts, there is no basis for administrative relief within the framework of the state industrial insurance system . . . ."

*Hansen,* 100 Nev. at 64-65, 675 P.2d at 397.

The statutory scheme applies only to the administration of the act. The statutes set forth fines to be paid for violations of the act, such as not paying claimants properly, or at all. It also provides that a self-insured employer may lose its certification if it violates the workers' compensation statutes. NRS 616D.030, as part of this statutory scheme, does not affect the case law of tortious discharge against public policy.

[A] tortious constructive discharge is shown to exist upon proof that: (1) the employee's resignation was induced by action and conditions that are violative of public policy; (2) a reasonable person in the employee's position at the time of resignation would have also resigned because of the aggravated and intolerable employment actions and conditions; (3) the employer had actual or constructive knowledge of the intolerable actions and conditions and their impact on the employee; and (4) the situation could have been remedied.

Martin v. Sears, Roebuck and Co., 111 Nev. 923, 926, 899 P.2d 551, 553 (1995) (citing Brady v. Elixir Industries, 196 Cal. App. 3d 1299, 1306 (Ct. App. 1987)). Here, the jury was properly instructed on the above elements.

We have held that "Nevada's workmen's compensation laws reflect a clear public policy favoring economic security for employees injured while in the course of their employment." *Hansen,* 100 Nev. at 63, 675 P.2d at 396.

Beckwith also requested and received a jury instruction concerning the provisions of NRS 616C.530, which provides that an insurer shall follow certain priorities in returning an injured employee to work, the first priority being to "[r]eturn the injured employee to the job he had before his injury." Dillard complains

that the instruction created a strict liability standard and in effect directed a verdict against it.

We disagree. The instruction, which by its terms only applies to operatives of a public or private workers' compensation plan, was offered to demonstrate Nevada's policy with regard to injured workers. The instruction was not offered as an assertion of strict liability or that a violation of NRS 616C.530 is a claim for which a worker may receive monetary damages. Beckwith's claim was that Dillard violated public policy by requesting her to return to work prior to being medically released. Dillard then punished Beckwith for her refusal to return to work against doctor's orders by demoting her. Clearly, the public policy of this state favors "economic security for employees injured while in the course of their employment." We conclude that the failure to follow the priorities set forth in the statute, together with Dillard's improper request that Beckwith return to work against doctor's orders, was a direct violation of that public policy. One of the elements necessary to prove constructive tortious discharge is that the action by the employer was in violation of public policy. The instruction was proper for this purpose. The judgment as to the tortious constructive discharge is affirmed.

*Intentional Infliction of Emotional Distress*

The elements of a cause of action for intentional infliction of emotional distress are "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." Star v. Rabello, 97 Nev. 124, 125, 625 P.2d 90, 92 (1981) (citation omitted). We have also held the "tort of intentional infliction of emotional distress is recognizable in the employment termination context." Shoen v. Amerco, Inc., 111 Nev. 735, 747, 896 P.2d 469, 476 (1995). In the present case, there was substantial evidence presented to support the intentional infliction of emotional distress claim. "[A] jury's verdict supported by substantial evidence will not be overturned unless the verdict is clearly erroneous when viewed in light of all the evidence presented." Frances v. Plaza Pacific Equities, 109 Nev. 91, 94, 847 P.2d 722, 724 (1993) (citing Bally's Employees' Credit Union v. Wallen, 105 Nev. 553, 555-56, 779 P.2d 956, 957 (1989)) (emphasis deleted).

Dillard did not offer Beckwith, a longtime employee, her previous position as an area sales manager when she returned to

work after her injury. This refusal occurred despite the fact that two other area sales manager positions were open for which Beckwith was qualified. She was also forced to take an entry-level position with a forty-percent reduction in salary and was told her demotion was directly related to her claim for workers' compensation. Ultimately fellow employees openly speculated as to the reason for Beckwith's demotion, and her complaints to management that her job situation was having an adverse effect on her health were ignored.

The elements of an intentional infliction of emotional distress claim are supported by the evidence and record. The judgment as to intentional infliction of emotional distress is affirmed.

## Compensatory Damages

Dillard asserts no compensatory damages should be allowed because the evidence did not show that Beckwith took steps to mitigate her damages, and her economic expert's figures were calculated on the assumption she would retire at age seventy-five. The jury was given instruction number forty-one, which reads as follows:

> Plaintiff Beckwith has a duty to mitigate her damages, that is an affirmative burden to act to minimize her damages. Defendants had the burden of proving that plaintiff failed to mitigate her damages. To satisfy this burden, defendants must prove that during the time in question (1) there were substantially equivalent jobs available, which plaintiff Beckwith could have obtained, and (2) that plaintiff failed to use reasonable diligence in seeking one.
>
> The phrase ''substantially equivalent'' means employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position which plaintiff Beckwith previously held with the defendants.

The second paragraph of the instruction is taken from Sellers v. Delgado College, 902 F.2d 1189, 1193 (5th Cir. 1990). Dillard objected because the phrase ''substantially equivalent'' was applied in a Title VII federal case. Instead, Dillard suggested the second paragraph should read ''she has a duty to seek reasonable alternative employment; the Plaintiff should accept any work which she could perform.'' This language was taken from Southern Pacific Transportation Company v. Fitzgerald, 94 Nev. 241, 243, 577 P.2d 1234, 1235 (1978). That case involved a personal injury action under the Federal Employers' Liability Act and was not a tortious constructive discharge case. In *Fitzgerald* we also said it was ''unclear whether any bona fide offers were in

fact made, or whether they related to reasonable alternative employment for a man with respondent's disabilities." *Id.*

In a similar wrongful discharge case we approved of an instruction which provided that an employee's duty to mitigate damages included "the seeking and acceptance of alternate employment." Beales v. Hillhaven, Inc., 108 Nev. 96, 101, 825 P.2d 212, 215 (1992). In *Beales* we recognized that "[t]he jury was instructed that Beales had the obligation to mitigate her damages by seeking other employment. She testified that she could not find *employment in her field* once she returned to Reno in 1988. Apparently, the jury believed her." *Beales* at 102, 825 P.2d at 216 (emphasis added). We conclude that the terms "substantial equivalent" and "reasonable alternative" are not so disparate in meaning as to warrant reversal. Thus, the error in the verbiage was harmless.[1]

Here there was ample testimony by Beckwith concerning her efforts to mitigate her damages. She was examined and cross-examined on this point. The jury was properly instructed on Beckwith's duty to mitigate her loss. "The question was one for the jury and beyond the scope of our review." United Assn. Journeymen v. Stine, 76 Nev. 189, 218, 351 P.2d 965, 980-81 (1960) (citations omitted).

Dillard failed to present any expert evidence to counter Beckwith's economic expert concerning her future losses. Once the jury found Beckwith was entitled to damages, "it was entitled to weight [sic] the variables and award . . . the appropriate amount." *Beales* at 102, 825 P.2d at 216. The compensatory damages awarded by the jury are proper and supported by substantial evidence in the record.

## Punitive Damages

"A plaintiff is never entitled to punitive damages as a matter of right; their allowance or denial rests entirely in the discretion of the trier of fact." Ramada Inns v. Sharp, 101 Nev. 824, 826, 711 P.2d 1, 2 (1985). "It is the responsibility of the trial court to determine whether, as a matter of law, the plaintiff has offered substantial evidence of malice in fact to support a punitive damages instruction." Wickliffe v. Fletcher Jones of Las Vegas, 99 Nev. 353, 356, 661 P.2d 1295, 1297 (1983) (citations omitted). Punitive damages are limited to three times the compensatory

[1]We note that "trial courts" should refrain from using the instruction given in this case. *Beales* states the proper standard.

damages, where, as here, compensatory damages are $100,000 or more. NRS 42.005(1)(a).

Dillard objected to the trial judge's decision to allow the nationwide worth, rather than just the worth of Dillard's Nevada, Inc., to determine the amount of punitive damages to award. We have previously allowed a nationwide worth when a jury decides punitive damages. Specifically, we have recognized "[t]he wealth of a defendant is directly relevant to the size of an award, which is meant to deter the defendant from repeating his misconduct as well as punish him for his past behavior." Ainsworth v. Combined Ins. Co., 104 Nev. 587, 593, 763 P.2d 673, 677 (1988) (citing Midwest Supply, Inc. v. Waters, 89 Nev. 210, 213, 510 P.2d 876, 878-79 (1973)).

The general rule concerning the award of excessive punitive damages has been previously stated by this court:

> Heretofore, we have recognized the subjective nature of punitive damages and the absence of workable standards by which to evaluate the propriety of such an award. Accordingly, we have allowed that determination to rest with the discretion of the trier of the fact unless the evidence introduced at trial shows that the amount awarded by the jury would financially destroy or annihilate the defendant in which event we would attempt an appropriate adjustment of the award.

Hale v. Riverboat Casino, Inc., 100 Nev. 299, 306, 682 P.2d 190, 194 (1984) (citations omitted).

In this case, the trier of fact determined the amount of punitive damages, and the trial court reduced the sum to an amount allowed by the statute. The award will not financially destroy or annihilate Dillard. Therefore, the punitive damage award is affirmed.

Beckwith is entitled to post-judgment interest on the punitive damage award. We recently modified our ruling in *Ainsworth* concerning post-judgment interest on punitive damages. We held that interest should accrue to compensate a party for the loss of the use of the money awarded in the judgment until paid. *See* Wohlers v. Bartgis, 114 Nev. 1249, 969 P.2d 949 (1998); Powers v. United Servs. Auto. Ass'n, 114 Nev. 690, 962 P.2d 596 (1998). Accordingly, Beckwith's punitive damage award shall accrue interest at the legal rate from the date of the judgment on the jury verdict.

*Attorney's Fees*

Dillard objects to the award of attorney's fees to Beckwith. Prior to trial an offer of settlement was made by Beckwith pursuant to NRS 17.115 and NRCP 68. She agreed to settle the matter for a total of $187,000, broken down to $93,500 as to each of the two Dillard entities. The purpose of NRS 17.115 and NRCP 68 is to save time and money for the court system, the parties and the taxpayers. They reward a party who makes a reasonable offer and punish the party who refuses to accept such an offer. *Muije v. A North Las Vegas Cab Co.*, 106 Nev. 664, 667, 799 P.2d 559, 561 (1990).

"It is within the discretion of the trial court judge to allow attorney's fees pursuant to Rule 68" and "[u]nless the trial court's exercise of discretion is arbitrary or capricious, this court will not disturb the lower court's ruling on appeal." *Schouweiler v. Yancey Co.*, 101 Nev. 827, 833, 712 P.2d 786, 790 (1985).

Dillard claims it litigated its defense in good faith and it was not bad faith for it to reject Beckwith's offer. We have set forth the factors a trial judge must exercise in its discretion regarding the allowance of attorney's fees:

> (1) whether the plaintiff's claim was brought in good faith; (2) whether the defendant's offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiff's decision to reject the offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount.

*Beattie v. Thomas*, 99 Nev. 579, 588-89, 668 P.2d 268, 274 (1983).

The trial judge, in a separate hearing, found it was unreasonable to reject such a "rock-bottom" offer given at the beginning of the case before any discovery expense had been incurred. The trial court considered the quality of the representation at trial, the reputation of the lawyers, their hourly rate of billing, the timing and reasonableness of the offer and all of the necessary factors set forth in *Beattie*. The trial judge deducted from the total amount of attorney's fees sought the amount Dillard had previously paid as sanctions for discovery abuses. There was no abuse of discretion on the part of the trial judge, the award of attorney's fees was proper and it is affirmed.

The judgment on the jury verdict for compensatory and punitive damages is affirmed.

ROSE, C. J., YOUNG, SHEARING, AGOSTI and BECKER, JJ., concur.

MAUPIN, J., concurring:

I agree with the result reached by the majority. I write separately to note my disagreement with the majority's affirmation of the instruction containing the language from NRS 616C.530. That provision sets priorities for workers' compensation *insurers* in their efforts to return injured workers to work. The priorities articulated do not create a legal standard governing an employer's re-assimilation of an injured worker to the work place. I can see no legislative intent to that effect. Thus, the instruction was couched in terms of a specific duty that did not apply to employers. However, because the statutory language did not add a great deal to the standard of recovery that respondent was required to satisfy below, the giving of the statutory instruction was harmless error.

I also wish to emphasize in this separate opinion my view that the enactment of NRS 616D.030 was in no way calculated to overturn our decision in Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984), and its progeny.